**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1941
_____

UNITED STATES OF AMERICA


v.


JOHNNY VASQUEZ-ALGARIN,
                                    Appellant
_____


On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-11-cr-00200-001)
District Judge:  Honorable Sylvia Rambo
_____


Argued:  February 11, 2016

Before:  FUENTES, KRAUSE, and ROTH *Circuit Judges.*

(Filed: May 2, 2016)
_____

Ronald A. Krauss, Esq.
Frederick W. Ulrich, Esq. (Argued)
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

*(Counsel for Appellant)*

Daryl F. Bloom, Esq. (Argued)
Stephen R. Cerutti, II, Esq.
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

*(Counsel for Appellee)*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Law enforcement officers need both an arrest warrant and a search warrant to apprehend a suspect at what they know to be a third party's home. If the suspect resides at the address in question, however, officers need only an arrest warrant and a "reason to believe" that the individual is present at the time of their entry. This case sits between these two rules and calls on us to decide their critical point of inflection: how certain must officers be that a suspect resides

at and is present at a particular address before forcing entry into a private dwelling?

A careful examination of the Supreme Court's Fourth Amendment jurisprudence reveals that the standard cannot be anything less than probable cause. Because here, law enforcement acted on information that fell short of the standard, we will vacate the conviction and remand to the District Court.

## I. Background

### A. Facts

In 2010, an arrest warrant was issued for Edguardo Rivera,[1] a suspect in a homicide case. Deputy U.S. Marshal Gary Duncan, a member of the Dauphin County Fugitive Task Force, received information from another law enforcement officer and from street informants that Rivera was "staying" or "residing" at an address on North 13th Street in Harrisburg, Pennsylvania. App. 25–26, 35–36. With the arrest warrant for Rivera in hand, Deputy Marshal Duncan and officers from the Harrisburg Bureau of Police and the Dauphin County Drug Task Force arrived at the apartment and knocked on the door. They received no response but "heard a lot of movement inside," as well as a phone ring once or twice and stop ringing and a dog bark and cease barking, giving the officers the impression that a person had

---

[1] The District Court uses a different spelling than the party briefs and the court transcripts, referring to the suspect as "Edwardo Rivera."

3

manually silenced the phone and muzzled the dog. App. 29–30. The officers then forcibly entered the home.

As it turned out, however, the sought fugitive, Rivera, did not live in the apartment and was not present.[2] Instead, upon entering, the officers saw Appellant Johnny Vasquez-Algarin, and, during a protective sweep, they identified in plain view sandwich baggies, a razor blade, and what appeared to be powder cocaine. After Vasquez-Algarin declined to grant consent for a search, one officer obtained a search warrant while the other officers waited at the apartment. During the subsequent search conducted pursuant to the warrant, the officers discovered ammunition, unused plastic bags, and hundreds of small black bands, as well as a cell phone in the master bedroom that was later searched pursuant to another search warrant. At some point during the search, the officers identified a set of car keys, which they used to open a stolen Mazda located across from the apartment. Vasquez-Algarin, who had no outstanding warrants, was then arrested.

**B.    Proceedings**

Vasquez-Algarin and the two brothers with whom he shared the apartment were each charged with distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii) and conspiracy to do the same in violation of 21 U.S.C. § 846. In October 2013, Vasquez-Algarin pleaded not guilty to the charges.

---

[2] The record contains no evidence of any connection between the two men.

4

The month before trial, Vasquez-Algarin moved to suppress the evidence seized from the North 13th Street residence, arguing that law enforcement's forced entry into the apartment was unconstitutional. At his suppression hearing, the Government presented three witnesses, all officers involved in various stages of Vasquez-Algarin's apprehension and arrest. Two witnesses, Deputy Marshal Duncan and Middletown Borough Police Detective Dennis Morris, testified about the sounds that officers heard coming from inside the residence on their arrival, but only Deputy Marshal Duncan could speak to the circumstances that led law enforcement to Vasquez-Algarin's residence.

Deputy Marshal Duncan testified that he had an arrest warrant for Edguardo Rivera and was given "reliable" information from a detective from the Harrisburg Bureau of Police and informants that Rivera lived at the North 13th Street address. App. 25, 26. During cross-examination, when defense counsel pressed Deputy Marshal Duncan to elaborate on "the exact factors" that led him to believe that Rivera lived at the address, Deputy Marshal Duncan reiterated that he had relied on "[i]nformation being provided to me by another law enforcement officer, information that we had from informants on the street that that address was being used by Mr. Rivera." App. 36. When counsel asked if, prior to going to the residence, Deputy Marshal Duncan had checked records for the resident of the apartment, he confirmed that he had but was unable to recall whether he had identified the renter of the apartment.

The District Court denied Vasquez-Algarin's motion to suppress, concluding from Deputy Marshal Duncan and Detective Morris's testimony that the officers had a "reasonable belief" and "probable cause to believe" that the

5

fugitive, Rivera, resided at the apartment and was present at the time of the officers' entry and that their entry was therefore constitutional.[3]  *United States v. Vasquez-Algarin*, No. 1:11-CR-0200-01, 2014 WL 1672008, at \*1–2 (M.D. Pa. Apr. 28, 2014).  At trial the next month, Deputy Marshal Duncan provided substantially the same information about what had led him to the North 13th Street address to apprehend Rivera.[4]  However, he offered a different answer to

---

[3] At the suppression hearing, there was some question as to Vasquez-Algarin's standing to challenge the search because he testified that the apartment was merely rented in his name and that he had moved out two months before the search, leaving only his dog in the apartment with his brothers.  He further represented he was in the apartment at the time of the search only because he had received a call from the landlord about problems with the rent and electricity.  The District Court determined that the master bedroom belonged to Vasquez-Algarin, "as he could not identify key details related to his alleged other residence, and was the individual on the lease of the 142 North 13th Street residence and kept possessions therein," and expressly rejected as "not credible" Vasquez-Algarin's claim that he no longer resided at the apartment at the time of the search. *Vasquez-Algarin*, 2014 WL 1672008, at \*2 n.2.  In addition, Vasquez-Algarin maintained at the suppression hearing that he had standing to assert a Fourth Amendment claim, and the Government does not now challenge his standing.

[4] Specifically, at trial Deputy Marshal Duncan testified that the U.S. Marshals Service "received information that Mr. Rivera could possibly be residing at an address on North 13th Street," App. 136, and that "the information . . . was provided

6

a question he also had been asked at the suppression hearing about why he spent significant time knocking and yelling at the door. At the suppression hearing, Deputy Marshal Duncan had testified that often residents will not come to the door for law enforcement but "if we stay there for a while, and you continue to knock and continue to not leave, typically you'll gain some response from somebody inside." App. 29. In his trial testimony, however, he identified a second reason he knocked for so long at the door in this case: "The address was not the address of record for Mr. Rivera, so we wanted to knock and attempt to gain contact with somebody inside and gain their consent to search the address." App. 138.

After a two-day trial, a jury convicted Vasquez-Algarin on both drug counts. He now appeals the District Court's denial of his suppression motion.[5] We review the District Court's legal conclusions de novo and the underlying factual findings for clear error. *United States v. Torres*, 534 F.3d 207, 209 (3d Cir. 2008). In the present context, where we are reviewing the denial of a motion to suppress to

---

to [him] by a detective from the City of Harrisburg who received the information that Mr. Rivera may be staying there," App. 137.

[5] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291. Because we vacate the conviction, we do not reach the second issue Vasquez-Algarin raises on appeal, whether the District Court committed clear error in applying a two-level sentencing enhancement for Vasquez-Algarin's role as an organizer, leader, manager or supervisor in the criminal activity under § 3B1.1(c) of the U.S. Sentencing Guidelines.

determine whether police officers had probable cause to believe the subject of their arrest warrant lived in the apartment they entered, we may look to the entire record and are "not restricted to the evidence presented at the suppression hearing where the motion was denied." *United States v. Silveus*, 542 F.3d 993, 1001 (3d Cir. 2008) (quoting *Gov't of the V.I. v. Williams*, 739 F.2d 936, 939 (3d Cir. 1984)).

## II.    Discussion

Vasquez-Algarin argues that law enforcement officers needed a search warrant to enter the North 13th Street apartment because the subject of their arrest warrant (the "arrestee"[6]) did not in fact reside there.  As we will explain below, however, their entry was constitutional if they had sufficient information to support a reasonable belief that the arrestee resided at and was present within the targeted home. To determine what reasonable belief requires, we will look to the principles set forth in the Supreme Court's key precedents, the views expressed by our sister Circuits and, most importantly, the fundamental tenets of Fourth

---

[6] The term "arrestee" is usually used to describe an individual who was been arrested, *see* Black's Law Dictionary (10th ed. 2014) (defining "arrestee" as "[s]omeone who has been taken into custody by legal authority; a person who has been arrested"), but in the *Payton* context, the courts regularly use the term to refer to the intended target of the arrest warrant.  For ease of reference, we use the term in this sense throughout the opinion, although the person eventually arrested in this case differed from the person named on the warrant.

Amendment jurisprudence governing the home. We conclude that to satisfy the reasonable belief standard law enforcement required, but lacked, probable cause. The officers' entry was therefore unconstitutional and, because the good-faith exception to the exclusionary rule is inapplicable here, the evidence seized from Vasquez-Algarin's apartment should have been suppressed.

## A.    *Payton* and *Steagald*

The Supreme Court has issued two major decisions regarding the constitutionality of in-home arrests.  Because here law enforcement officers believed, albeit mistakenly, that the home they were entering was the residence of the subject of their arrest warrant, the controlling authority is the first of these decisions, *Payton v. New York*, 445 U.S. 573 (1980).    There, the Supreme Court considered two consolidated cases in which police officers entered private residences without any kind of warrant to make routine felony arrests and held that the state statutes that had authorized these warrantless entries were unconstitutional; the officers were required to have an arrest warrant to arrest a suspect in his home.  *Id.* at 602–03.  In a dictum that has since evolved into a tenet of Fourth Amendment jurisprudence, the Court also observed that a search warrant would not be required in that circumstance because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives when there is reason to believe the suspect is within.*"  *Id.* at 603 (emphasis added).

In the wake of *Payton*, to assess the constitutionality of an officer's entry into a home to execute an arrest warrant, the Courts of Appeals have drawn upon the Supreme Court's language to develop a two-prong test that extends to residency: the officer must have a "reasonable belief"[7] that

_____

[7] Close examination reveals the Courts of Appeals have uniformly cast *Payton*'s "reason to believe" language as a reasonable belief standard.  *See, e.g.*, *United States v. Gorman*, 314 F.3d 1105, 1114–15 (9th Cir. 2002).  However,

10

(1) the arrestee resides at the dwelling, and (2) the arrestee is present at the time of the entry. *See, e.g.*, *United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006) (quoting *United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir. 2001)).

A different framework applies, however, where officers believe an individual for whom they have an arrest warrant is a guest in a third-party home. A year after handing down *Payton*, the Supreme Court held in *Steagald v. United States*, 451 U.S. 204 (1981), that officers may not enter a third party's residence to execute an arrest warrant without first obtaining a search warrant "based on their belief that [the suspect] might be a guest there," unless the search is consensual or justified by exigent circumstances. *Id.* at 213, 216. In so reasoning, the Court rejected the Government's argument as to the "practical problems [that] might arise if law enforcement officers are required to obtain a search warrant before entering the home of a third party to make an arrest," and concluded that "the inconvenience incurred by the police is simply not that significant" and in any event "cannot outweigh the constitutional interests at stake." *Id.* at 220–22.

Before us is a case of mistaken belief that underscores the tension between the residency test that the Courts of Appeals have derived from *Payton* and the relatively robust Fourth Amendment protections guaranteed to third-party homes under *Steagald*.[8] Because officers may force entry

---

as discussed *infra* in Section II.B, they diverge on what that standard requires.

[8] Vasquez-Algarin was not the arrestee sought nor, as far as the record shows, connected to the arrestee in any way.

into a home as long as they have a reasonable belief the suspect resides and is present there, but must have nothing short of a search warrant where the suspect is a guest in a third party's home, law enforcement's assessment of a suspect's residency is, in effect, a determination of the level of protection to which a dwelling is entitled. Our choice about how much and what kind of information must form the basis for that critical determination thus affects not only the homes of arrestees but also any home that could be mistaken for one. For that reason, we must draw not only from the principles laid out in *Payton* but also from those set forth in *Steagald* when determining just how stringent the reasonable belief standard must be. With these principles in mind, we next consider our own precedent relevant to this issue and the case law of our sister Circuits that have addressed the issue squarely, but with divergent results.

### B. The reasonable belief standard

Vasquez-Algarin contends that this Court has already equated "reason to believe" or "reasonable belief" with a probable cause standard, and the District Court appears to have assumed probable cause applied as well. *Vasquez-Algarin*, 2014 WL 1672008, at *1. The issue, however, remains an open question in our Circuit.

---

This distinguishes this case from any of our relevant precedents and from many of the cases in which other Courts of Appeals have had occasion to interpret and apply the *Payton* reasonable belief standard. *See, e.g.*, *Veal*, 453 F.3d 164 (defendant was the intended arrestee); *United States v. Agnew*, 407 F.3d 193 (3d Cir. 2005) (same).

12

Vazquez-Algarin is correct that we treated reasonable belief and probable cause as equivalent in *United States v. Agnew*, 407 F.3d 193 (3d Cir. 2005). There, in applying the *Payton* reasonable belief test, we observed that "police may enter a suspect's residence to make an arrest armed only with an arrest warrant if they have probable cause to believe that the suspect is in the home." *Id.* at 196. Yet in that case the government possessed sufficient information to meet the standard irrespective of its precise definition, so we had no occasion to analyze the point and it had no effect on our holding. Recognizing as much, we observed the following year in *Veal* that although "[o]ur Court . . . has described the test using the language of 'probable cause,'" the courts had taken different approaches to the question, and we decided, under these circumstances, that we would "determine whether a possibly lower standard of reasonable belief should be applied" another day. 453 F.3d at 167 n.3.

That day has arrived. Because a number of our sister Circuits have opined on this issue, we review their approaches for their persuasive value before staking out our own. As described below, these approaches vary widely: Although the Courts of Appeals once overwhelmingly interpreted reasonable belief as less stringent than probable cause, they are now nearly evenly divided on this point.[9]

---

[9] In the last decade, a number of Courts of Appeals have expressed agreement with the Ninth Circuit's longstanding view that reasonable belief amounts to probable cause. *See United States v. Harper*, 928 F.2d 894, 897 (9th Cir. 1991), *overruled on other grounds by United States v. King*, 687 F.3d 1189, 1189 (9th Cir. 2012) (en banc) (per curiam); *accord United States v. Jackson*, 576 F.3d 465, 469

13

The D.C., First, Second and Tenth Circuits have determined that reasonable belief requires less than probable cause.[10] *See United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005); *United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995); *Valdez v. McPheters*, 172 F.3d 1220, 1224–25 (10th Cir. 1999). But those courts have offered little by way of explanation for this interpretation. In *Thomas*, the D.C. Circuit observed that, to date, most of the appellate courts had determined that reasonable belief is a less stringent standard than probable cause and that it was "more likely . . . that the Supreme Court in *Payton* used a phrase other than 'probable cause' because it meant something other than 'probable cause.'" 429 F.3d at 286. In *Valdez*, the Tenth Circuit offered a more detailed explanation for its adoption of a standard less stringent than probable cause, but rather than explaining why probable cause would be inappropriate, the court focused entirely on the impracticability of imposing on

---

(7th Cir. 2009); *United States v. Hardin*, 539 F.3d 404, 416 & n.6 (6th Cir. 2008); *see also United States v. Barrera*, 464 F.3d 496, 501 & n.5 (5th Cir. 2006) (equating the two terms and describing the disagreement among the appellate courts as "semantic"); *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997) (analogizing reasonable belief to probable cause but ultimately rejecting the latter standard).

[10] Even those courts that agree that reasonable belief is a lower standard than probable cause disagree on its precise definition. *Compare, e.g.*, *Gay*, 240 F.3d at 1227 (describing reasonable belief and reasonable suspicion as "two different legal standards"); *with Werra*, 638 F.3d at 337 (equating reasonable belief to reasonable suspicion).

officers an "actual knowledge" requirement, which none of the Courts of Appeals has imposed in applying *Payton*. *See Valdez*, 172 F.3d at 1224–25 (10th Cir. 1999) (criticizing the Ninth Circuit's adoption of the probable cause standard in part because "requiring actual knowledge of the suspect's true residence would effectively make *Payton* a dead letter"). *But see United States v. Hill*, 649 F.3d 258, 274 (4th Cir. 2011) (Agee, J., dissenting) ("[N]o court applying [*Payton*] has ever held[] that the police must have seen the defendant nearby or have actual knowledge that he is inside a residence before they can enter."); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995) ("[P]robable cause itself is a doctrine of reasonable probability and not certainty.").

The Fifth, Sixth, Seventh and Ninth Circuits have endorsed—or, in the case of the Seventh Circuit, "inclined" toward—interpreting reasonable belief as the equivalent, or functional equivalent, of probable cause. *See United States v. Barrera*, 464 F.3d 496, 500-01 & n.5 (5th Cir. 2006); *United States v. Hardin*, 539 F.3d 404, 415–16 & n.6 (6th Cir. 2008); *United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009); *United States v. Gorman*, 314 F.3d 1105, 1114–15 (9th Cir. 2002). [11] To reach this conclusion, some of these Courts of Appeals have looked to the Supreme Court's own post-

_____

[11] The Sixth Circuit has reconsidered its position on the issue. In *Hardin*, the Sixth Circuit rejected as dictum its previous determination in *United States v. Pruitt* that reasonable belief is a less stringent standard than probable cause, and, in new dictum, endorsed Judge Clay's concurring opinion in *Pruitt* that equated the two standards. *Hardin*, 539 F.3d at 415 & n.6 (citing *United States v. Pruitt*, 458 F.3d 477, 490 (6th Cir. 2006) (Clay, J., concurring)).

*Payton* characterization of its "reason to believe" language, as well as the terms with which the Court has generally defined the probable cause standard.

Most notably, in *Maryland v. Buie*, 494 U.S. 325 (1990), when considering whether officers executing a home arrest pursuant to *Payton* could also perform a protective sweep of the residence, the Supreme Court concluded that "[p]ossessing an arrest warrant and *probable cause* to believe *Buie* was in his home, the officers were entitled to enter and to search anywhere in the house in which *Buie* might be found." *Id.* at 332–33 (emphasis added). According to the Sixth and Ninth Circuits, this passage is most naturally read to mean that the Supreme Court intended the *Payton* "reason to believe" language to serve as a reference to probable cause. *See Hardin*, 539 F.3d at 416 n.6 ("Had the Court truly intended the 'reason to believe' language in *Payton* to set forth a new, lesser standard, surely the Court in *Buie* would have explained that the officers were entitled to be inside Buie's residence on the basis of an arrest warrant and a 'reasonable belief' as to Buie's presence, but the Court used the term 'probable cause' instead."); *accord Gorman*, 314 F.3d at 1114.[12]

---

[12] As these courts have pointed out, Justice White's description of the majority opinion in his dissent in *Payton* provides additional support for interpreting *Payton*'s "reason to believe" language as a reference to probable cause. *Hardin*, 539 F.3d at 410; *Gorman*, 314 F.3d at 1114 & n.10. His disagreement with the majority was predicated in part on his understanding that "under [the majority's] decision, the officers apparently need an extra increment of *probable cause* when executing the arrest warrant, namely, grounds to believe

16

As further evidence that reasonable belief amounts to probable cause, some of these Courts of Appeals have also considered the Supreme Court's tendency to explain and define the term "probable cause" using "grammatical analogues" of "reason to believe." *Hardin*, 539 F.3d at 416 n.6 (citing *Pruitt*, 458 F.3d at 490 (Clay, J., concurring)). For example, the Court has described probable cause as requiring a "reasonable ground for belief." *Pruitt*, 458 F.3d at 490 (Clay, J., concurring) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003); *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also Illinois v. Gates*, 462 U.S. 213, 243 (1983) (suggesting that "probable cause" is synonymous with "'reasonable grounds' to believe").

Among the Courts of Appeals that have equated reasonable belief with probable cause, the Fifth Circuit is notable in that it has also concluded that "the courts that distinguish the terms have done so because 'probable cause' is a term of art." *See Barrera*, 464 F.3d at 501 & n.5 (citing *United States v. Woods*, 560 F.2d 660 (5th Cir. 1977); *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997)). We do not necessarily agree with the suggestion in *Barrera* that the disagreement among the Circuits as to whether reasonable belief equates to probable cause is "more about semantics than substance." *Id.* The D.C. Circuit, for instance, appears to require significantly less evidence to support a belief of residency than the other Courts of Appeals, presumably in part as a result of its choice to depart from the probable cause standard and the protections it affords. *See, e.g.*, *Thomas*, 429 F.3d at 286 (holding that officers had requisite reasonable

that the suspect is within the dwelling." *Payton*, 445 U.S. at 616 n.13 (White, J., dissenting) (emphasis added).

17

belief to enter residence where arresting marshals provided no testimony about where they had obtained the parolee's address except to say that an "investigation was done" and the address "turned up").

We do agree with the Fifth Circuit, however, that probable cause has specialized usage and is not a standard typically applied by police to settle a question of the kind before us about where an individual lives.[13]  Although the Supreme Court has long insisted on a "practical, nontechnical" definition of probable cause, *Gates*, 462 U.S. at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)), describing it as a "fluid concept" that defies "reduc[tion] to a neat set of legal rules," *id.* at 232, the fluidity of the concept has not translated into diverse application.  A close reading of the case law shows that the Supreme Court uses the "probable cause" standard almost exclusively to assess the basis and strength of an officer or

---

[13]  The awkwardness that the Fifth Circuit has identified, of applying the probable cause standard in the *Payton* context, *see Route*, 104 F.3d at 62, may be a function of the appellate courts' recasting of the *Payton* "reason to believe" standard—which the Supreme Court used to describe only whether the arrestee was present within the residence— as a two-part test in which that same standard governs both whether the dwelling is the arrestee's residence and whether the arrestee is inside.  Applying the probable cause standard to determine only whether the arrestee is present within the home presents no such difficulties.  *Cf. Steagald*, 451 U.S. at 213–14 n.7 ("[T]he plain wording of the Fourth Amendment admits of no exemption from the warrant requirement when the search of a home is for a person rather than for a thing.").

magistrate's belief that a particular person has committed a particular crime or that an article subject to seizure can be found at a particular location—in short, whether criminal activity is afoot. *See, e.g.*, *Brinegar*, 338 U.S. at 175 ("The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." (internal quotation marks omitted)).

The Supreme Court's general practice of reserving probable cause language to these circumstances perhaps helps account for the Eighth and Eleventh Circuits' decision to simply treat reasonable belief as its own standard for purposes of applying the *Payton* test. The Eleventh Circuit in *Magluta*, observing that "it is difficult to define the *Payton* 'reason to believe' standard, or to compare the quantum of proof the standard requires with the proof that probable cause requires," side-stepped the comparison altogether and treated the inquiry as, in essence, its own reasonableness determination. 44 F.3d at 1535–36 (citing *Woods*, 560 F.2d at 665); *accord United States v. Risse*, 83 F.3d 212, 216–17 (8th Cir. 1996) (employing a similar test and citing *Magluta*).[14] Relying on the same case law as the Fifth Circuit in *Barrera*, the Eleventh Circuit thus opted for a "practical interpretation of *Payton*" that resembles probable cause in that "in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and

[14] Although *Woods* predated *Payton*, the Eleventh Circuit has deemed the cases consistent. *Magluta*, 44 F.3d at 1536. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

19

circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." *Magluta*, 44 F.3d at 1535; *cf. Gates*, 462 U.S. at 238 (explaining that, for purposes of a probable cause determination, a "totality of the circumstances" analysis requires the magistrate issuing a warrant "simply to make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

## C. Reasonable belief as probable cause

Having considered the different approaches of our sister Circuits and their reasoning where provided, we join the Fifth, Sixth, Seventh and Ninth Circuits in holding that *Payton*'s "reason to believe" language amounts to a probable cause standard.[15]  As explained more fully below, we do so for two reasons.  First, the Supreme Court's use of the phrase "reason to believe," when considered in the context of *Payton* and more generally the Court's Fourth Amendment jurisprudence, supports a probable cause standard.  Second, and more fundamentally, requiring that law enforcement

---

[15] The Seventh Circuit has stated its "inclin[ation] to adopt the view . . . that 'reasonable belief' is synonymous with probable cause," *Jackson*, 576 F.3d at 469, and the Sixth Circuit has endorsed the view that the two standards are synonymous in what it conceded was dictum, *Hardin*, 539 F.3d at 415–16 & n.6.

officers have probable cause to believe their suspect resides at and is present within the dwelling before making a forced entry is the only conclusion commensurate with the constitutional protections the Supreme Court has accorded to the home.

We consider first the Court's use of the term "reason to believe" in *Payton* and other criminal cases. On careful reading, *Payton* appears to be a case in which the Court used the terms "probable cause" and "reason to believe" in close proximity and interchangeably. This is readily apparent when we examine how the *Payton* Court couched its analysis. Expressly "put[ting] to one side related problems that are *not* presented today," the Court noted that neither of the consolidated cases before it in *Payton* involved exigent circumstances or consent, the home of a third party, or allegations "that the police lacked probable cause to believe that the suspect was at home when they entered." *Payton*, 445 U.S. at 582–84. It is within this carefully bounded factual framework—the search of an arrestee's home without exigent circumstances or consent but with *probable cause* to believe he was present—that the Court concluded its decision with the observation that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603.

*Payton* is not an anomaly. On several occasions, the Supreme Court has used the very same "reason to believe" language that appears in *Payton* as a stand-in for "probable cause." For example, in the landmark case *Berger v. New York*, 388 U.S. 41 (1967), where the Court held that the wiretapping statute in question violated the Fourth Amendment because it authorized suspicionless

21

eavesdropping, the Court explained that "[t]he purpose of the *probable cause* requirement of the Fourth Amendment [is] to keep the state out of constitutionally protected areas until it has *reason to believe* that a specific crime has been or is being committed." *Id.* at 59 (emphases added). In *Gerstein v. Pugh*, 420 U.S. 103 (1975), the Court likewise observed that at common law the justice of the peace would "determine whether there was reason to believe the prisoner had committed a crime" and that this "initial determination of probable cause" could be reviewed on a writ of habeas corpus. *Id.* at 114–15. And in *Cardwell v. Lewis*, 417 U.S. 583 (1974) (plurality opinion), after recounting all of the evidence that established that police had "probable cause to search [the suspect's] car," the Court concluded that the resulting composite "provided reason to believe that the car was used in the commission of the crime." *Id.* at 592. Examples of this kind serve to undercut the D.C. Circuit's conclusion that *Payton*'s "reason to believe" should be construed loosely simply because the Court elected to use a phrase other than "probable cause" to describe the requisite belief law enforcement must have that an arrestee is present in his dwelling at the time of the search. *Thomas*, 429 F.3d at 286.

Although the language of *Payton* and the Supreme Court's other Fourth Amendment decisions provides strong support for interpreting reasonable belief as a probable cause standard, it is the nature of the privacy interests at stake that solidifies our conclusion.[16] Without question, the home takes

---

[16] We recognize that there are limits to parsing language alone to determine what the Supreme Court intended by its use of the phrase "reason to believe" in

22

pride of place in our constitutional jurisprudence. As the Supreme Court has reiterated on numerous occasions, "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from

---

*Payton*, because the Court has not adhered to hard and fast rules when using "reasonableness" language. For example, the Court has sometimes referred to "reasonable belief" when discussing "reasonable suspicion," *see, e.g.*, *Buie*, 494 U.S. at 336–37; *United States v. Place*, 462 U.S. 696, 703–04 (1983), a practice that has been cited by at least one Court of Appeals to suggest *Payton* may require less than probable cause, *see, e.g.*, *Pruitt*, 458 F.3d at 484. The Court's references to "reasonable belief" outside the *Payton* context, however, have little relevance to our inquiry, particularly as the phrase "reasonable belief" does not actually appear in *Payton* and using it as shorthand for "reason to believe" is an adaptation of the Courts of Appeals. Conversely, our holding today that the "reason to believe" or short-hand "reasonable belief" standard equates to probable cause is limited to the *Payton* context and should not be construed to mean that "reasonable belief," "reasonable grounds to believe," or a substantially similar iteration means probable cause in other circumstances. While the Supreme Court has occasionally discussed reasonable suspicion in terms of "reasonable belief," for example, reasonable suspicion is "obviously less demanding" than probable cause, *United States v. Sokolow*, 490 U.S. 1, 7 (1989), and nothing we have said today bears on that line of cases, *see, e.g.*, *United States v. Arvizu*, 534 U.S. 266 (2002); *Alabama v. White*, 496 U.S. 325 (1990); *Terry v. Ohio*, 392 U.S. 1 (1968).

unreasonable governmental intrusion.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)). Indeed, such intrusion is "the chief evil against which the wording of the Fourth Amendment is directed." *Payton*, 445 U.S. at 585.

The vaunted place of the home in our constitutional privacy jurisprudence was central to the Supreme Court's analysis in *Payton* and *Steagald*. *See, e.g.*, *Payton*, 445 U.S. at 585–90; *Steagald*, 451 U.S. at 220, 222. These cases together provide insight that neither case provides alone—insight that leads inexorably to the conclusion that the Circuit-created two-prong test is workable only if governed by a robust reasonableness standard akin to probable cause, and that anything less would defeat the "stringent . . . protection" the home is due. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976) (private homes are "ordinarily afforded the most stringent Fourth Amendment protection").

On one hand, adopting a too-rigorous interpretation of "reason to believe" seems at odds with the portion of *Payton* leading up to the Court's articulation of the "reason to believe" rule:

> It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, *but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen*. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to

24

open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Payton*, 445 U.S. at 602–03 (emphasis added). This language seems to cut against interpreting the "reason to believe" standard too stringently insofar as the Court clearly indicates that the probable cause determination required for an arrest warrant already offers much of the requisite protection. *Payton*, by its terms, however, applies only with respect to an individual for whom an arrest warrant has been issued and with respect to the place where he resides. *See id.* at 583.

On the other hand, where there is uncertainty about where the arrestee resides—a situation not presented in *Payton* but encompassed within the Circuit-created two-prong test—we must take care not to adopt an interpretation of "reason to believe" that requires of law enforcement so little evidence that an arrestee resides at a dwelling as to expose all dwellings to an unacceptable risk of police error and warrantless entry. Here, *Steagald* comes into play, for to adopt such an interpretation would be to disregard the explanation the Court provides there for why it chose to distinguish *Payton* and to conclude, in effect, that the homes of fugitives and non-fugitives are entitled to different degrees of Fourth Amendment protection:

Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to

25

arrest him in his home. *This analysis, however, is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a third party to conduct a search.* Such a warrant embodies no judicial determination whatsoever regarding the person whose home is to be searched. Because it does not authorize the police to deprive the third person of his liberty, it cannot embody any derivative authority to deprive this person of his interest in the privacy of his home. Such a deprivation must instead be based on an independent showing that a legitimate object of a search is located in the third party's home. We have consistently held, however, that such a determination is the province of the magistrate, and not that of the police officer.

*Steagald*, 451 U.S. at 214 n.7 (emphasis added). Like *Payton*, *Steagald* does not contemplate the possibility of uncertain residency, nor does it address the proper means of resolving that uncertainty. But read alongside *Payton*, the Court's reasoning in *Steagald* makes clear that its determination of the legality of a forced home entry in this context turns on whether the officer has the benefit of some type of probable cause determination by a neutral arbiter, be that by way of an arrest warrant or search warrant.

Given this precedent and the constitutional principles at stake, law enforcement armed with only an arrest warrant may not force entry into a home based on anything less than probable cause to believe an arrestee resides at and is then present within the residence. A laxer standard would effect an end-run around the stringent baseline protection

26

established in *Steagald* and render all private homes—the most sacred of Fourth Amendment spaces—susceptible to search by dint of mere suspicion or uncorroborated information and without the benefit of any judicial determination. Such intrusions are "the chief evil against which the wording of the Fourth Amendment is directed." *Payton*, 445 U.S. at 585. We therefore join those Courts of Appeals that have held that reasonable belief in the *Payton* context "embodies the same standard of reasonableness inherent in probable cause." *Gorman*, 314 F.3d at 1111; *accord Barrera*, 464 F.3d at 501.

### D. Application

Having defined the reasonable belief standard as equivalent to probable cause, we have no trouble concluding that law enforcement did not meet that standard as to either prong of the *Payton* test here, and the District Court erred in concluding otherwise.

To make a probable cause determination, we must consider the "totality of the circumstances," *Silveus*, 542 F.3d at 1000 (citing *Gates*, 462 U.S. at 238), which, in the context of second-hand information, encompasses considerations such as the basis and reliability of the information and the receiving officer's ability to corroborate its content, *United States v. Ritter*, 416 F.3d 256, 262–64 (3d Cir. 2005) (citing *Alabama v. White*, 496 U.S. 325 (1990)).

Here, to meet *Payton's* first prong, Deputy Marshal Duncan relied entirely on informant tips and the word of another detective but provided little information by which the District Court could assess the information he obtained. At the suppression hearing, Deputy Marshal Duncan explained

27

only that he had based his belief that the intended arrestee, Rivera, lived at the North 13th Street address on information conveyed to him by another officer and by informants. He did not identify the number of informants, their reliability based on any prior interactions he may have had with them, the specific information they related, or even whether he obtained information from "informants on the street" first-hand or through the other officer. App. 36. Nor did he describe with any specificity the information provided by that other officer or the basis for that officer's statement. *See Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."); *Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997) ("[S]tatements by fellow officers conveying that there is probable cause for a person's arrest, by themselves, cannot provide the "facts and circumstances" necessary to support a finding of probable cause . . . . The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who *issued* the statements possessed the requisite basis to seize the suspect.").

In his trial testimony, moreover, Deputy Marshal Duncan cast further doubt on the reasonableness of his belief that the dwelling was Rivera's residence when he explained that the officers knocked vigorously and waited at the door for a prolonged period in part because "[t]he address was not the address of record for Mr. Rivera, so we wanted to knock and attempt to gain contact with somebody inside and gain their consent to search the address." App. 138. This explanation suggests that, at the time of entry, Deputy Marshal Duncan not only had limited basis to believe Rivera

28

resided at the apartment but also possessed evidence that gave him significant doubt. *Cf. Hill*, 649 F.3d at 263–64 (officers did not have reason to believe arrestee was present, because, among other things, police had documented another residence for arrestee based on a recent traffic citation, and the lead officer on the scene testified that he did not believe the arrestee would be present).

Nor are we persuaded that the Government met its burden as to *Payton*'s second prong, i.e., that it established probable cause to believe Rivera was present in the apartment by way of the suspicious sounds the officers heard coming from inside. True, the Government's burden at this stage is not onerous, for the threshold determination that there is probable cause to believe the home is the arrestee's residence not only entitles that home to lesser protections under *Payton* but also, as a logical matter, increases the likelihood the arrestee can be found within it. *See Payton* 445 U.S. at 602 (recognizing "that an arrest warrant requirement may afford less protection than a search warrant requirement"). Thus, once the predicate of residency is established, that alone carries significant weight in establishing probable cause to believe the arrestee is present, necessarily reducing the quantum of proof needed to meet *Payton*'s second prong in the totality of the circumstances analysis.

Ultimately, however, that analysis must be made on a case-by-case basis, accounting not only for the fact that there is an increased likelihood the arrestee will be found in his own home but also for other indicia supporting law enforcement's belief that the suspect is then inside. *See, e.g.*, *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007) (officers reasonably believed that arrestee was home because he himself told government agents that he was usually home

29

during the day, they knew he worked at home as a mechanic, and when they had previously visited he was absent only once); *Pruitt*, 458 F.3d at 483 (officers had reasonable belief parolee was inside the residence where, among other things, an individual exiting the residence matched the parolee's picture to the person selling drugs inside); *United States v. Beck*, 729 F.2d 1329, 1331–32 (11th Cir. 1984) (per curiam) ("Beck's car, identified by the agents, was parked nearby; and it was reasonable to believe that one would be at home at 7:30 a.m. and be sound asleep . . . ." (footnote omitted)).

Here, because the officers lacked probable cause to believe Rivera lived in the home, mere signs of life inside, even if suspicious, could not establish probable cause to believe he was present and could not justify their warrantless entry into Vasquez-Algarin's apartment. Indeed, such bootstrapping would be clearly untenable as a logical matter, for law enforcement cannot compensate for the deficiency of the information underlying its belief that a suspect even lives at a particular residence by way of generic evidence indicating merely that someone is inside the home. *Cf. Shea v. Smith*, 966 F.2d 127, 131 (3d Cir. 1992) (observing that "[i]f the police lack probable cause to believe the suspect is an actual resident, but have probable cause to believe he's present, they must get a search warrant." (quoting *Harper,* 928 F.2d at 896)).

In sum, we note that on both prongs of the *Payton* test, the information that law enforcement relied upon to justify breaking into Vasquez-Algarin's apartment contrasts sharply in kind and quantity from the information deemed sufficient by this Court and other Courts of Appeals applying the probable cause standard. *See, e.g.*, *Veal*, 453 F.3d at 168 (officers lawfully entered the home of the arrestee's wife

30

where the parole violation warrant indicated he was no longer living at his last known address and listed his wife as a possible lead, his former landlord reported that the couple had lived together in the apartment they rented from him, and the car the arrestee allegedly drove was registered to his wife and parked near her home); *Route*, 104 F.3d at 62–63 (officer confirmed that the arrestee's credit card applications, utility bills and vehicle registration matched the address of the residence, and at the residence observed a known associate backing out of the driveway, another vehicle in the driveway, and noise coming from a television inside the home); *Jackson*, 576 F.3d at 469 (concluding "the police had enough evidence to easily satisfy a probable cause standard" where they received a tip that the arrestee was residing at a friend's apartment and, on their arrival, the arrestee's girlfriend confirmed he was inside).

Just as private citizens are provided protection from mistaken arrest by the requirement that law enforcement have probable cause to believe they committed the crime in question, private homes must be protected from mistaken entry by, at minimum, a probable cause determination as to whether the suspect sought even lives there. Because the officers lacked information sufficient to meet that threshold in this case, their entry into Vasquez-Algarin's home and the subsequent searches were unconstitutional, and, absent some exception to the exclusionary rule, the evidence they seized should have been suppressed. We turn, then, to the Government's argument that one such exception is applicable.

### E. The good-faith exception

The Government argues that even if officers unlawfully entered Vasquez-Algarin's home, his conviction should stand because the exclusionary rule has no application and the evidence is admissible under the good-faith exception where law enforcement's conduct was not "deliberate, reckless, or grossly negligent." Gov't Br. at 24–25 (citing *Herring v. United States*, 555 U.S. 135 (2009)). We are not persuaded on these facts by the Government's invocation of the good-faith exception.

The Supreme Court has "over time applied [the] good-faith exception across a range of cases" where applying the exclusionary rule would not "yield 'appreciable deterrence.'" *Davis v. United States*, 131 S. Ct. 2419, 2426, 2428 (2011) (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)). For example, the Court has held that, under the good-faith exception, evidence need not be suppressed where police conduct a search in "objectively reasonable reliance" on a search warrant subsequently deemed invalid, *United States v. Leon*, 468 U.S. 897, 922 (1984), or on a statute subsequently held unconstitutional, *Illinois v. Krull*, 480 U.S. 340, 360 (1987).

Drawing on this line of cases, in *Davis*, the Supreme Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." 131 S. Ct. at 2429. And in our en banc decision in *United States v. Katzin*, 769 F.3d 163 (3d Cir. 2014), this Court, in turn, relied on *Davis* and the Supreme Court's prior good-faith decisions to conclude that the exception applies not only where law enforcement agents act on binding appellate precedent but also, and more

32

fundamentally, where the officers act "upon an objectively reasonable good faith belief in the legality of their conduct." *Id.* at 182.

In neither respect is the exception warranted in this case. First, the Government does not purport to rely on binding appellate precedent for its assertion that the officers had sufficient information to forcibly enter Vasquez-Algarin's home, nor could it in view of the binding Supreme Court authority in *Payton* and *Steagald* that points the other way. Even *Herring*—which the Government cites not as binding appellate precedent on these facts but for the general proposition that a finding of a Fourth Amendment violation does not compel automatic reversal—weighs in favor of suppression. *Herring* involved a county's inadvertent failure to update its database concerning a recalled arrest warrant— "isolated negligence attenuated from the arrest" that the Court determined was not "sufficiently deliberate that exclusion can meaningfully deter it" or "sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S. at 137–38, 144. In contrast, here we are confronted not with an inadvertent recordkeeping error but with a deliberate decision to force entry into a home based on only vague and uncorroborated information as to whether the subject of the arrest warrant even lived there. The gulf between this case and *Herring* is only reinforced by Deputy Marshal Duncan's trial testimony acknowledging documentation in his possession that caused him concern that this was a third-party residence for which he needed consent to search.

We thus turn to the second and more fundamental inquiry we undertook in *Katzin*, the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal under all of the

33

circumstances." 769 F.3d at 179 (quoting *Leon*, 468 U.S. at 922 n.23). In making this determination, we consider the decisions set forth by the Supreme Court, our Court and our sister Circuits. *See id.* at 182–84. As is apparent from our survey of the case law, however, those decisions also favor suppression.

Read together, *Payton* and *Steagald* make clear that, because of the sanctity of the home, nothing less than probable cause is appropriate when it comes to determining whether a home belongs to an arrestee and to undertaking a forced entry on the basis of an arrest warrant alone. *See supra* Section II.A. As for our own precedent, although we have clarified today that "reasonable belief" in the *Payton* context does indeed amount to probable cause, our decisions to date have assumed as much and used probable cause as the applicable standard. *See Veal*, 453 F.3d at 167 n.3; *Agnew*, 407 F.3d at 196. Lastly, where this Court and our sister Circuits have upheld the validity of police entries into homes under *Payton*, it has been on the basis of far more specific and reliable information than what the officers relied upon here to enter Vasquez-Algarin's apartment, *see* Section II.D, and conversely, where the only evidence available has been of such meager quantity and quality, the Courts of Appeals have held that suppression is appropriate, *see, e.g.*, *Werra*, 638 F.3d at 341; *Hardin*, 539 F.3d at 427. Thus, in contrast with *Katzin*, where "[t]he constellation of circumstances that appeared to authorize [the officers'] conduct included well settled principles of Fourth Amendment law as articulated by the Supreme Court [and] a near-unanimity of circuit courts applying these principles to the same conduct," 769 F.3d at 182, the very opposite is true here.

We do not take lightly the "significant social costs of suppressing reliable, probative evidence." *Id.* However, we are compelled to enforce the exclusionary rule where law enforcement officers, "at the time they acted, would have or should have known their [conduct] w[as] unconstitutional." *Id.* at 179. The Government's argument in this case boils down to the proposition that law enforcement officers may forcibly enter a home based on nothing more than the general representation of another law enforcement officer and the vague and uncorroborated assertions of unidentified informants that the intended arrestee lives there. We reject this position as inconsistent with fundamental Fourth Amendment principles and the language and logic of Supreme Court precedent governing in-home arrests. Given the dictates of *Payton* and *Steagald*, our prior applications of *Payton* in *Veal* and *Agnew*, and the out-of-Circuit precedent consistently holding law enforcement to a higher bar than what was proffered here to justify a forced home entry, we conclude the officers' conduct was, at a minimum, "grossly negligent," and thus was "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring,* 555 U.S. at 144.

## III. Conclusion

For the foregoing reasons, we will reverse the District Court's denial of Vasquez-Algarin's motion to suppress, vacate the conviction, and remand for proceedings consistent with this opinion.

35