#28671-aff in pt & rev in pt-SRJ
**2021 S.D. 7**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

GARETH HAMEN AND SHARLA HAMEN,            Plaintiffs and Appellees,

v.

HAMLIN COUNTY, SOUTH DAKOTA,
CHAD SCHLOTTERBECK, HAMLIN
COUNTY SHERIFF, and SHERIFF'S
DEPUTIES JOHN DOE AND JOHN
ROE, et al., individually (names unknown),            Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
HAMLIN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT L. SPEARS
Judge

* * * *

DAVID R. STRAIT of
Austin, Hinderaker, Hopper, Strait
   & Benson LLP
Watertown, South Dakota            Attorneys for plaintiffs and
appellees.


JAMES E. MOORE
JOEL E. ENGEL III of
Woods, Fuller, Shultz & Smith, P.C.
Sioux Falls, South Dakota            Attorneys for defendants and
appellants.

* * * *

ARGUED
SEPTEMBER 30, 2019
OPINION FILED **02/10/21**

#28671

JENSEN, Chief Justice

[¶1.] Gareth and Sharla Hamen (the Hamens) filed a complaint against Hamlin County (the County), the Hamlin County Sheriff Chad Schlotterbeck (the Sheriff), and other John Doe deputies after the Hamens' mobile home was damaged during the arrest of their son, Gary Hamen. The Hamens sought compensation for inverse condemnation and stated a separate claim for deprivation of constitutional rights under 42 U.S.C. § 1983. The parties filed cross-motions for summary judgment. The circuit court granted summary judgment to the County, dismissing the claims without prejudice, but denied the other motions. We granted the petition for discretionary appeal filed by the County and the Sheriff. We reverse the circuit court's denial of summary judgment on the inverse condemnation claim. We affirm in part and reverse in part the circuit court's denial of summary judgment on the § 1983 claim.

## Background

[¶2.] On June 9, 2016, at about 11:30 a.m., the Sheriff and Watertown Police Detective Chad Stahl stopped at Gareth Hamen's residence near Castlewood, South Dakota. They were looking for Gareth's son, Gary, who had outstanding arrest warrants for felony burglary and misdemeanor violations of a protection order. Police reports indicated that earlier that morning Gary had threatened to shoot himself and anyone he came into contact with. The Sheriff asked Gareth if Gary owned any guns. Gareth told him that he knew Gary owned a few, but he had never seen them.

-1-

[¶3.]     Gary called Gareth while law enforcement was still at Gareth's house. The officers could overhear the conversation. Gary asked Gareth to pick him up because law enforcement was looking for him, and he stated that he needed a car to go to Canada or Mexico. Gareth did not tell Gary that the officers were present. Gareth asked Gary where he was, and Gary replied he was at Gareth's mobile home. The Hamens purchased the mobile home in 1997 for their daughter to live in, but later decided to fix it up and rent it out. It was located about 600 feet northwest of Gareth's house. Gareth allowed Gary to live in the mobile home when Gary was not working.

[¶4.]     After learning of Gary's location, the Sheriff and Detective Stahl left Gareth's residence and went to the Sioux Rural Water Plant, approximately 1/2 mile south and 1/2 mile west of the mobile home. From their location, the officers observed Gary leave the mobile home but then walk back inside. At this time, the Sheriff requested assistance from the Watertown Police Department SWAT Team.

[¶5.]     Sergeant Kirk Ellis arrived with the Watertown SWAT team and set up a loose perimeter around the mobile home. However, law enforcement was unable to monitor all four sides of the mobile home. A drone was procured early in the search to survey the mobile home and the surrounding area, but the drone footage revealed no sign of Gary. Officers then tightened the perimeter around the mobile home and blocked the surrounding access roads. Sergeant Ellis parked an armored vehicle about forty yards from the residence and attempted to contact Gary through a PA system. There was no response.

[¶6.]     While the SWAT team attempted to contact Gary, officers received a report that a local resident had observed Gary running towards Castlewood. The resident reported that Gary came out of a tree line near a river and sewage pond, but he had run back into the trees. Sergeant Ellis and the SWAT team tried to locate Gary in this area and encountered another witness who also believed he had seen Gary. An officer inside the armored vehicle called Gary's cellphone. Gary answered the phone call and claimed he was almost to Minnesota. He sounded out of breath, like he was running.

[¶7.]     Meanwhile, the Sheriff spoke with Gary's brother-in-law, Tim Hofwalt. Tim was married to Gary's sister, Julie Hofwalt. They lived on a farm within view of the mobile home. Tim reported that Gary, who appeared to be high, was at their home the previous night, and Tim gave Gary some food. Julie was sleeping while Gary was at the home. Tim told the Sheriff that Gary had a gun in a holster under his arm, but Tim did not see any other guns. After seeing the gun, Tim asked Gary to leave; and Gary obliged. During Tim's conversation with law enforcement, Tim claimed that he overheard voices on radio traffic stating that the mobile home had been cleared and that Gary was seen running near the river.

[¶8.]     The Sheriff shared the information from Tim with the other law enforcement officers. The Sheriff also requested assistance from the Codington County Special Response Team (SRT) and Highway Patrol to further secure the area and ensure Gary did not make it to Castlewood. Then the Sheriff spoke with Gary's sister, Julie. Julie told law enforcement that she did not know that Gary had

been to her home the previous night because she was asleep and had left early for work in the morning.

[¶9.]    The SRT arrived, led by Codington County Sheriff Toby Wishard. The SRT brought in a second armored vehicle to clear the shelterbelt in search of Gary. During the search, the SRT located a suitcase containing male clothes, a bag with needles, a cell phone, and an empty gun case. Wishard and the Sheriff believed that the suitcase confirmed that Gary was armed and possibly using illegal substances. They agreed that the mobile home needed to be cleared to ensure Gary was not in it.

[¶10.]    Before clearing the mobile home, Wishard and the SRT met Julie at her residence. The officers conducted a search of Julie's house and outbuildings for Gary. The officers were unable to access one padlocked outbuilding. Julie stated the officers "were calm and respectful and did not damage anything during the search." Julie told an officer that Gary was likely hiding in the willows west of Gareth's house, where he liked to hide and play as a child. Following the search of the farm, an officer told Gareth that they were going to enter the mobile home, but they did not state their intention to remove doors and windows with the armored vehicles. Law enforcement did not ask Gareth for consent to enter the mobile home.

[¶11.]    Meanwhile, Troy Jurrens, who ran a business from his home nearby, was listening to the transmissions of law enforcement on a police scanner as they attempted to locate Gary. He stated: "someone announced on the radio that they were 'going back to the trailer,'" to which another voice responded, "he's not in the

trailer." Troy claimed, "The first voice answered back saying they were going back anyway."

[¶12.] Not long after, the Sheriff authorized SWAT and the SRT to breach doors and windows on the Hamens' mobile home. According to Wishard's affidavit, the "tactical procedure [to secure the mobile home] is to create communication portholes in attempts to call out any subject or subjects that may be hiding inside." If unsuccessful, gas munitions are used to flush out anyone inside. To create the communication portholes for the Hamens' trailer, an armored vehicle pulled away the front stairs and deck, which were not attached to the mobile home or secured in the ground, and pushed in the front door with a ram. The second armored vehicle opened three portholes on the opposite side of the mobile home by breaking through windows and a sliding patio door, causing significant damage to the walls and the septic system. Shortly after this procedure and before officers entered the mobile home, Gary was seen walking in the river near the Hamens' residence. Law enforcement apprehended him at approximately 6:00 p.m.

[¶13.] The Hamens filed a complaint against the County, the Sheriff, and other John Doe deputies for inverse condemnation under article VI, § 13 of the South Dakota Constitution and a claim under 42 U.S.C. § 1983 for violations of rights under the Fourth and Fourteenth Amendments of the United States Constitution. The Hamens claimed that the damage caused by the armored vehicles totaled $18,778.61.

[¶14.] The County and the Sheriff moved for summary judgment on both claims. The Hamens filed a cross-motion for summary judgment. Following a

hearing, the circuit court granted summary judgment to the County. The court concluded there was nothing to establish that there was an official policy or custom on the part of the County approving or condoning the damage to the mobile home, and thus the County could not be liable. However, the court determined that genuine issues of material fact existed concerning the § 1983 claims against the Sheriff. In its memorandum decision, the court wrote that article VI, § 13 of the South Dakota Constitution may also support a claim for a constitutional violation as a basis for the § 1983 claim, but the court did not directly address the Hamens' separate claim for inverse condemnation. The court also denied the Hamens' cross-motion for summary judgment. The County and the Sheriff petitioned for discretionary appeal, which we granted. They raise two issues, restated as follows:

1.    Whether damage caused by law enforcement during the arrest of an alleged fleeing felon is a compensable taking under article VI, § 13 of the South Dakota Constitution.

2.    Whether the Sheriff was entitled to qualified immunity on the Hamens' § 1983 claim.

**Standard of Review**

[¶15.]    We review a grant or denial of summary judgment de novo. *Thornton v. City of Rapid City*, 2005 S.D. 15, ¶ 4, 692 N.W.2d 525, 528-29. "[W]e must determine whether the moving party demonstrated the absence of any genuine issue of material fact and established entitlement to judgment on the merits as a matter of law." *Id.* (quoting *Citibank (S.D.), N.A. v. Hauff*, 2003 S.D. 99, ¶ 10, 668 N.W.2d 528, 532). We view the evidence "most favorably to the nonmoving party, and reasonable doubts should be resolved against the moving party." *Id.* On appeal, our task "is to determine only

whether a genuine issue of material fact exists and whether the law was correctly applied." *Id.*

[¶16.]    "An appeal asserting an infringement of a constitutional right is also an issue of law to be reviewed under the *de novo* standard of review." *Benson v. State*, 2006 S.D. 8, ¶ 39, 710 N.W.2d 131, 145 (citing *State v. Dillon*, 2001 S.D. 97, ¶ 12, 632 N.W.2d 37, 43). "Under the *de novo* standard of review, we give no deference to the circuit court's conclusions of law." *Id.* (citing *Sherburn v. Patterson Farms, Inc.*, 1999 S.D. 47, ¶ 4, 593 N.W.2d 414, 416). Similarly, whether qualified immunity protects officers is a question of law. *Swedlund v. Foster*, 2003 S.D. 8, ¶ 12, 657 N.W.2d 39, 45.

## Analysis and Decision

> **1.    Whether damage caused by law enforcement during the arrest of an alleged fleeing felon is a compensable taking under article VI, § 13 of the South Dakota Constitution.**

[¶17.]    The Hamens assert a claim for inverse condemnation, arguing they are entitled to compensation under the damages clause of article VI, § 13 of the South Dakota Constitution, which provides that "[p]rivate property shall not be taken for public use, *or damaged*, without just compensation[.]" (Emphasis added.) The damages clause provides greater protection to property owners than the United States Constitution by requiring "that the government compensate a property owner not only when a taking has occurred, but also when private property has been 'damaged.'" *State ex rel. Dep't of Transp. v. Miller*, 2016 S.D. 88, ¶ 39, 889 N.W.2d 141, 153 (quoting *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 9, 827 N.W.2d 55, 60). The intent of the "clause is to ensure that individuals are not

unfairly burdened by disproportionately bearing the cost of projects intended to benefit the public generally." *Rupert*, 2013 S.D. 13, ¶ 9, 827 N.W.2d at 61 (quoting *Hall v. State ex rel. S.D. Dep't of Transp.*, 2011 S.D. 70, ¶ 37, 806 N.W.2d 217, 230). "[T]he ultimate determination of whether government conduct constitutes a taking or damaging is a question of law for the court." *Id.* ¶ 29, 827 N.W.2d at 67.

[¶18.]    A party may seek compensation under the damages clause of article VI, § 13 of the South Dakota Constitution through an action for inverse condemnation. *Id.* ¶ 43, 827 N.W.2d at 70-71. "An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner." *Schliem v. State ex rel. Dep't of Transp.*, 2016 S.D. 90, ¶ 13 n.9, 888 N.W.2d 217, 224 n.9 (quoting *Breidert v. S. Pac. Co.*, 394 P.2d 719, 721 n.1 (Cal. 1964)). Inverse condemnation proceedings allow landowners to recover just compensation when eminent domain proceedings have not been instituted. *Rupert*, 2013 S.D. 13, ¶ 10 n.4, 827 N.W.2d at 61 n.4.

[¶19.]    Our cases have only permitted recovery for damage or devaluation to private property when the government's action with respect to the property has been undertaken for public use. *See, e.g.*, *Schliem*, 2016 S.D. 90, 888 N.W.2d 217; *Rupert*, 2013 S.D. 13, 827 N.W.2d 55; *Krier v. Dell Rapids Twp.*, 2006 S.D. 10, 709 N.W.2d 841. The Court has denied "compensation when the state action complained of is labeled a manifestation of the police power[.]" *Schliem*, 2016 S.D. 90, ¶ 14 n.11, 888 N.W.2d at 225 n.11. "No return of the property nor compensation is allowed where the state establishes that its actions were done under its police power such as to abate a public nuisance." *Cody v. Leapley*, 476 N.W.2d 257, 261

(S.D. 1991). *See also Schafer v. Deuel Cnty. Bd. of Comm'rs*, 2006 S.D. 106, ¶ 11, 725 N.W.2d 241, 245 ("Although it is axiomatic that private property cannot be taken without due process of law, this limitation does not shield private property from regulations, such as zoning, which are implemented under the police power."); *Darnall v. State*, 79 S.D. 59, 68, 108 N.W.2d 201, 206 (1961) (holding that certain highway restrictions and regulations "have been []upheld as proper exercises of the police power of the state and not of the power of eminent domain. As such they are not compensable").

[¶20.] The Hamens acknowledge that law enforcement's actions in arresting Gary involved a police power function, but argue that law enforcement exceeded the legitimate exercise of its police power by unreasonably damaging their mobile home. In the Hamens' view, they are entitled to compensation under article VI, § 13 if the Sheriff unreasonably entered the mobile home without consent and unnecessarily damaged the home when Gary was not present.

[¶21.] The Sheriff responds that "the issue is not the reasonableness of the officer's conduct, but whether the conduct constitutes a taking of private property for public use (by the authority of the state's power of eminent domain), or action to preserve the safety, health and general welfare of the public (by the authority of the state's police power)." He argues that article VI, § 13 applies exclusively to the State's authority to take or damage property for a public use, not its police power. The Sheriff contends that it is undisputed that his actions on June 9, 2016, involved the exercise of police power, and the Hamens are therefore precluded from asserting a claim for compensation under the damages clause of article VI, § 13. The Sheriff

argues that any other result would transform the eminent domain provision into a tort cause of action for which the State has not expressly waived sovereign immunity. *See Rupert,* 2013 S.D. 13, ¶ 33, 827 N.W.2d at 67-68 (holding that the Legislature must expressly waive sovereign immunity).

[¶22.]    The Hamens initially argue that applying a reasonableness analysis to police power functions under article VI, § 13 is consistent with this Court's decision in *Cody v. Leapley,* 476 N.W.2d 257 (S.D. 1991). In that case, Cody sued a warden for damages under article VI, § 13, claiming the warden improperly confiscated property he owned. *Id.* at 260. The sole question in *Cody* was whether a prison warden was exercising the State's police power in confiscating the property of an inmate. *Id.* at 261. In remanding the case to the circuit court, *Cody* concluded that "the trial court was not provided with a factual basis to determine" whether the warden was acting under the authority of SDCL 24-2-26 at the time the property was taken.[1] *Id.* The Court made no suggestion that the reasonableness of the warden's actions was determinative of the right to compensation under article VI, § 13. Instead, the Court reaffirmed that no "compensation is allowed [under article VI, § 13] where the state establishes that its actions were done under its police power." *Id.* at 261.

[¶23.]    We have not previously considered whether the actions of law enforcement in damaging private property while apprehending a fleeing felon may,

---

1.    SDCL 24-2-26 authorizes the warden to confiscate any property belonging to an inmate, "which is unlawful for an inmate to possess pursuant to state law or the rules of the Department of Corrections." *Cody* recognized that the statute was a legislative grant of police power to the warden. 476 N.W.2d at 261.

under any circumstance, create a right of compensation under the damages clause of article VI, § 13. When reviewing an issue of first impression, we may also consider decisions from other jurisdictions for guidance. *See, e.g.*, *Briggs v. Briggs*, 2019 S.D. 37, 931 N.W.2d 510, 513; *Milstead v. Smith*, 2016 S.D. 55, 883 N.W.2d 711. Thus, we briefly review other decisions that have addressed this precise question.

[¶24.] The California Supreme Court denied a claim under the damages provision of the California Constitution when a store owner filed an inverse condemnation action for property damage caused by law enforcement in apprehending a felony suspect.[2] *Customer Co. v. City of Sacramento*, 895 P.2d 900, 901 (Cal. 1995). In *Customer Co.*, law enforcement deployed tear gas in the store to flush a suspect out, causing extensive damage to the building and store inventory. *Id.* The court concluded, under article 1, § 19 of the California Constitution, that neither the language "taken" nor "damaged" had been applied outside the context of eminent domain or public works; and the actions of law enforcement had no relation to the governmental function of taking property for public use or public improvement. *Id.* at 906, 913.

[¶25.] Similarly, in *Sullivant v. City of Oklahoma City*, the Oklahoma Supreme Court denied a claim for damages under the Oklahoma Constitution after

---

2. C.A. Const. art. 1, § 19 provides: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

-11-

law enforcement damaged an apartment unit while executing a search warrant.[3] 940 P.2d 220, 222 (Okla. 1997). The *Sullivant* court reasoned that "the provision, taken in its full context, clearly relates to condemnation proceedings, where real property is actually taken and used for a public project." *Id.* at 224. "[T]he addition of the 'or damaged' language to the taking provision merely expanded the circumstances when a private owner may recover" for damage to adjacent property when a governmental action involves a public use or public work. *Id.* at 226.

[¶26.]     In *Eggleston v. Pierce County*, the Washington Supreme Court denied a claim for damages under the Washington Constitution after a home was substantially damaged during the execution of a criminal search warrant.[4] 64 P.3d 618, 620 (Wash. 2003). *Eggleston* summarized its review of cases from other jurisdictions as follows:

> Those courts rejecting takings claims based on police destruction of property have relied on the original understanding of the constitutions and the continuing vitality of the separate doctrines of eminent domain and police power. The courts that have found takings have been justifiably outraged by the destruction of real property owned by third parties utterly unconnected with the alleged crime. . . . We decline to abandon the framework established by our constitution. The proper apportionment of the burdens and benefits of public life are best addressed to the legislature, absent a violation of a right held by an individual seeking redress under the appropriate vehicle.

---

3.     The Oklahoma Constitution also contains a right to compensation for damage to property. "Private property shall not be taken or damaged for public use without just compensation." O.K. Const. art. 2, § 24.

4.     The takings clause of the Washington Constitution provides: "No private property shall be taken or damaged for public or private use without just compensation having been first made[.]" W.A. Const. art. 1, § 16.

*Id.* at 626 (citations omitted). *Accord Brutsche v. City of Kent*, 193 P.3d 110, 113 (Wash. 2008) (reaffirming *Eggleston* and rejecting a claim for damages when law enforcement used a battering ram to gain entry to the property). *See also Lech v. Jackson*, 791 F. App'x 711, 714 n.6, 719 (10th Cir. 2019) (noting that the Colorado Takings Clause's interpretation is "essentially the same" as the U.S. Takings Clause and holding that "the damage caused in the course of arresting a fugitive on plaintiffs' property was not a taking for public use, but rather it was an exercise of the police power").

[¶27.]        In contrast, the Iowa Supreme Court held in *Kelley v. Story County Sheriff* that a property owner may, in limited circumstances, seek compensation as a taking under the Iowa Constitution when law enforcement officers damage private property.[5]  611 N.W.2d 475 (Iowa 2000).  The court determined the "point at which police power becomes so oppressive that it results in a taking is determined on a case-by-case basis[,]" and the applicable test is "essentially one of reasonableness[.]" *Id.* at 480.  *See also Brewer v. State*, 341 P.3d 1107, 1114 (Alaska 2014) (declining to hold under the Alaska Takings Clause "that every valid exercise of the police power . . . results in a noncompensable taking"); *Soucy v. State*, 506 A.2d 288, 290 (N.H. 1985) (discussing under the New Hampshire Takings Clause that whether an exercise of police power goes "too far . . . must be determined under its own circumstances" rather than a categorical exception).

---

5.        "Private property shall not be taken for public use without just compensation first being made[.]"  Iowa Const. art. 1, § 18.

[¶28.] At least two states have allowed recovery by eminent domain for property damage caused by law enforcement during the execution of a warrant. In *Wegner v. Milwaukee Mut. Ins. Co.*, the Minnesota Supreme Court upheld the right of a homeowner to seek compensation under the Minnesota Constitution when police damaged her property while apprehending a suspect.[6] 479 N.W.2d 38, 41 (Minn. 1991). The court did not address the "public use" language in the Minnesota Constitution, but stated that "simply labeling the actions of the police as an exercise of the police power 'cannot justify the disregard of the constitutional inhibitions.'" *Id.* at 40 (quoting *Petition of Dreosch,* 47 N.W.2d 106, 111 (Minn. 1951)).

[¶29.] Further, in *Steele v. City of Houston,* the Texas Supreme Court determined that a right to compensation existed under the Texas Constitution for a property owner whose property was damaged by law enforcement while apprehending three escaped convicts.[7] 603 S.W.2d 786, 791 (Tex. 1980). Rejecting the City's claim that it was exercising its police power, the *Steele* court broadly defined public use to include any intentional destruction of property by a governmental entity, including any "real or supposed public emergency to apprehend armed and dangerous men who had taken refuge in the house." *Id.* at 792.

---

6. "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." M.N. Const. art. 1, § 13.

7. "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made[.]" T.X. Const. art. 1, § 17.

[¶30.]     After reviewing the language of article VI, § 13 of the South Dakota Constitution and decisions from other jurisdictions, we join the courts that have denied a right of compensation by eminent domain when law enforcement damages private property while executing a warrant or pursuing a fleeing felon.  Courts which have denied compensation under similar eminent domain provisions of their state constitutions have properly applied "the framework established by [their] constitution" that a taking or damage claim arises from a public use function, rather than a police power function.  *Eggleston*, 64 P.3d at 626.

[¶31.]     A reading of the damages clause within the entirety of article VI, § 13 shows that the "public use" language is equally applicable to a claim for a taking or for damage.[8]  Moreover, our prior decisions have consistently applied the public use language in article VI, § 13 to both the takings and damages clauses, while rejecting

---

8.     S.D. Const. art. VI, § 13 provides:

> Private property shall not be taken for public use, or damaged, without just compensation, which will be determined according to legal procedure established by the Legislature and according to § 6 of this article.  No benefit which may accrue to the owner as the result of an improvement made by any private corporation shall be considered in fixing the compensation for property taken or damaged.  The fee of land taken for railroad tracks or other highways shall remain in such owners, subject to the use for which it is taken.

The inclusion of a comma before the language "or damaged" does not render the damage clause independent from the language "taken for public use." "Punctuation shall not control or affect the construction of any provision when any construction based on such punctuation would not conform to the spirit and purpose of such provision." SDCL 2-14-8. *See also LaBore v. Muth*, 473 N.W.2d 485, 489 (S.D. 1991) (holding that a phrase in a statute separated by a semicolon was dependent when the statute was read as a whole).

a right to compensation under article VI, § 13 when the action involved the state's police power.

[¶32.] Finally, there is no language in article VI, § 13 to support the Hamens' argument that an unreasonable use of police power is compensable under the eminent domain section of the Constitution. While article VI, § 13 abrogates sovereign immunity for cases involving the State's public use function, public entities are "free from liability for tort claims unless waived by legislative enactment." *Long v. State*, 2017 S.D. 79, ¶ 17, 904 N.W.2d 502, 508 (quoting *Truman v. Griese*, 2009 S.D. 8, ¶ 9, 762 N.W.2d 75, 78). This Court may not waive sovereign immunity against the State in the absence of legislative authority to do so. Therefore, the Hamens' claim for inverse condemnation against the County or the Sheriff, under article VI, § 13, should have been dismissed by the circuit court on summary judgment.

### 2. Whether the Sheriff was entitled to qualified immunity on the Hamens' § 1983 claim.

[¶33.] The Civil Rights Act of 1871, codified at 42 U.S.C. §1983, creates a civil cause of action for a deprivation of constitutional rights. To establish a cause of action under § 1983, a plaintiff must prove that a person has deprived him or her of a federal right, and that the person was acting under the "color of state or territorial law." *Swedlund*, 2003 S.D. 8, ¶ 15, 657 N.W.2d at 46.

[¶34.] Sovereign immunity is not a defense to a § 1983 claim, but "police officers, under certain situations, may raise the defense of qualified immunity" when an officer has made a good faith mistake. *Id.* ¶ 16, 657 N.W.2d at 46. Qualified immunity is a "legal question to be decided by the court and is

particularly amenable to summary judgment." *Id.* ¶ 12, 657 N.W.2d at 45. When resolving the question of qualified immunity on a motion for summary judgment, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 1774, 167 L. Ed. 2d 686 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962)). "[T]his usually means adopting . . . the plaintiff's version of the facts." *Id.* at 378, 127 S. Ct. at 1775.

[¶35.] "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability[.]'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Therefore, the United States Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation" because the immunity defense is "effectively lost if a case is erroneously permitted to go to trial." *Id.* at 231-32, 129 S. Ct. at 815.

[¶36.] In analyzing qualified immunity, a court undertakes a two-step inquiry to determine (1) whether the facts viewed most favorably to the injured party "show the officer's conduct violated a constitutional right" and (2) whether the constitutional right was clearly established. *Thornton*, 2005 S.D. 15, ¶ 11, 692

N.W.2d at 530-31. "Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts. [The] reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time the action was taken.'" *Ziglar v. Abbasi*, __ U.S. __, __, 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290 (2017) (internal citations omitted).

[¶37.]     Since our decisions in *Swedlund* and *Thornton*, the United States Supreme Court has reinforced a high bar to meet the requirements of the second prong of qualified immunity, particularly when considering Fourth Amendment claims.

> Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time. "Clearly established" means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law.

*D.C. v. Wesby*, __ U.S. __, __,138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (internal citations and quotation marks omitted). *See also Ziglar*, __ U.S. at __, 137 S. Ct. at 1867 ("[I]f a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.").

[¶38.]     Further, courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818. This flexible approach allows for the

doctrine to fulfill its purpose of preventing unnecessary litigation. *Id*. at 236-37, 129 S. Ct. at 818.

[¶39.] The Sheriff argues that the circuit court erred in concluding that questions of fact existed on qualified immunity. He asserts that the court should have determined as a matter of law that no constitutional violations occurred, and even if a constitutional right was violated, the right was not clearly established. The Hamens respond that fact questions exist as to whether the Sheriff violated the Fourth Amendment by entering the mobile home to arrest Gary without a search warrant, consent, or exigent circumstances. The Hamens alternatively argue that the Sheriff used excessive force by unnecessarily damaging the mobile home in violation of the Fourth Amendment. The Hamens argue that both the unlawful entry and excessive force claims are violations of clearly established rights.

### a. Legality of the warrantless entry into the Hamens' mobile home.

[¶40.] "[I]t is well established that 'searches and seizures inside a home without a warrant are presumptively unreasonable.'" *State v. Hess*, 2004 S.D. 60, ¶ 22, 680 N.W.2d 314, 324 (quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980)). "Generally, this means that, with some specifically delineated exceptions, every law enforcement entry into a home for the purpose of search and seizure must be made with a warrant." *Id.* (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967)). Exigent circumstances "is one of the well-delineated exceptions." *State v. Fischer*, 2016 S.D. 12, ¶ 13, 875 N.W.2d 40, 45. "Exigent circumstances will justify a warrantless entry into a home for the purpose of either arrest or search . . . when

there is an emergency: a situation demanding immediate attention with no time to obtain a warrant." *Hess*, 2004 S.D. 60, ¶ 24, 680 N.W.2d at 325 (citations omitted).

[¶41.]	In 1980, *Payton v. New York* created another exception to the warrant requirement for the search of a residence under the Fourth Amendment. *Payton* considered challenges by two convicted defendants to a New York law permitting warrantless entry of a home to make a routine felony arrest based upon probable cause. 445 U.S. at 573, 100 S. Ct. at 1373. *Payton* held the New York law to be unconstitutional under the Fourth Amendment and reiterated that, absent exigent circumstances or a search warrant, law enforcement cannot enter a home to make an arrest. *Id.* However, *Payton* recognized that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603, 100 S. Ct. at 1388.

[¶42.]	Shortly after *Payton*, the United States Supreme Court held that in the absence of a search warrant or exigent circumstances, law enforcement may not enter the home of a third party to execute an arrest warrant on a suspect. *Steagald v. United States*, 451 U.S. 204, 216, 101 S. Ct. 1642, 1649-50, 68 L. Ed. 2d 38 (1981). In *Steagald*, law enforcement had an arrest warrant for a suspect and entered the home of a third party to look for the suspect. 451 U.S. at 204, 101 S. Ct. at 1643. Law enforcement did not find the suspect, but they observed contraband in the home and arrested the third party on drug charges. *Id.* *Steagald* determined the evidence located in the third party's home should be suppressed under the Fourth

Amendment stating:

> while the [arrest] warrant in this case may have protected [the
> suspect] from an unreasonable seizure, it did absolutely nothing
> to protect [the third party's] privacy interest in being free from
> an unreasonable invasion and search of his home. Instead, [the
> third party's] only protection from an illegal entry and search
> was the agent's personal determination of probable cause. In
> the absence of exigent circumstances, we have consistently held
> that such judicially untested determinations are not reliable
> enough to justify an entry into a person's home to arrest him
> without a warrant[.][9]

451 U.S. at 220, 101 S. Ct. at 1648.

[¶43.] One court, addressing the rules created by *Payton* and *Steagald,* has described application of the cases as follows: "both *Payton* and *Steagald* treated the concept of residence as absolute and immutable, drawing a bright line around a third party's residence, while affording a lesser degree of protection to an arrestee's residence." *Commonwealth v. Romero*, 183 A.3d 364, 390 (Pa. 2018). Another court has reconciled the cases around *Payton's* "reasonable belief" standard, holding that law enforcement's belief that a suspect resides and is present in a home is determinative.

> Because officers may force entry into a home as long as they
> have a reasonable belief the suspect resides and is present there,

---

9.    We have applied the holdings of *Payton* and *Steagald* in cases involving warrantless entries into homes. In *Hess*, we recognized the *Payton* exception in stating that "[a] valid arrest warrant implicitly grants to police the limited authority to enter a suspect's residence 'when there is *reason to believe the suspect is within.*'" *State v. Hess*, 2004 S.D. 60, ¶ 21, 680 N.W.2d at 324 (quoting *Payton*, 445 U.S. at 603, 100 S. Ct. at 1388) (emphasis added). We have also acknowledged *Steagald's* limitation on the *Payton* exception and held that law enforcement must obtain a search warrant before entering the home of a third party to execute an arrest warrant for another person in the absence of exigent circumstances. *State v. Meyer*, 1998 S.D. 122, ¶ 44, 587 N.W.2d 719, 729.

> but must have nothing short of a search warrant where the suspect is a guest in a third party's home, law enforcement's assessment of a suspect's residency is, in effect, a determination of the level of protection to which a dwelling is entitled.

*United States v. Vasquez-Algarin*, 821 F.3d 467, 473 (3d Cir. 2016). Thus, the reasonable belief threshold set out in *Payton* becomes "critical" because it "affects not only the homes of arrestees but also any [third party] home that could be mistaken for one." *Id.*

[¶44.] Both *Payton* and *Steagald* must inform the reasonable belief standard. *Id.* Some courts have read the language from *Payton* and *Steagald* to require that "law enforcement armed with only an arrest warrant may not force entry into a home based on anything less than probable cause to believe an arrestee resides at and is then present within the residence." *Id.* at 480. *See also United States v. Hardin*, 539 F.3d 404, 415-16 (6th Cir. 2008); *United States v. Barrera*, 464 F.3d 496, 501 (5th Cir. 2006); *United States v. Gorman*, 314 F.3d 1105, 1114–15 (9th Cir. 2002). Other courts have read *Payton* to require something less than probable cause. "[U]nder *Payton*, police officers entering a residence pursuant to an arrest warrant must demonstrate a reasonable belief that the arrestee lived in the residence, and a reasonable belief that the arrestee could be found within the residence at the time of the entry." *Valdez v. McPheters*, 172 F.3d 1220, 1224 (10th Cir. 1999). *See also United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011); *United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996).

[¶45.] We conclude that, at a minimum, the Sheriff's warrantless entry into the mobile home required an objectively reasonable belief that Gary was living in

and present in the home at the time of entry. *See State v. Meyer*, 1998 S.D. 122, ¶ 39, 587 N.W.2d 719, 727 (discussing *Payton* and the reasonable belief standard). *See also Hess*, 2004 S.D. 60, ¶ 21, 680 N.W.2d at 324. A "court must look at all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect resided there and would be found within" the home. *Valdez*, 172 F.3d at 1226. The question whether the warrantless entry was supported by an objectively reasonable belief that Gary was living in and present in the mobile home at the time of entry is a question of law for the circuit court. *See Scott*, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8 (holding that once the relevant set of facts are determined, the reasonableness of the officer's actions "is a pure question of law").[10] However, the ultimate resolution of this legal question is dependent upon a resolution of certain facts in this undeveloped record.

[¶46.]     Undisputed facts in the existing record show that the Sheriff knew that the Hamens allowed Gary to stay in the mobile home when he was not working, and that Gary was present in the home at the time law enforcement first arrived. These facts support a reasonable belief that Gary was present in the mobile home. However, disputed facts exist concerning Gary's whereabouts after

---

10.     *Scott* was decided after our decision in *Thornton*, where we stated that "the objective reasonableness of the officer's actions under the first prong of the qualified immunity analysis, which determines whether a constitutional violation has occurred, is a jury question." 2005 S.D. 15, ¶ 13, 692 N.W.2d at 531. Consistent with the United States Supreme Court's holding in *Scott*, we now overrule this statement in *Thornton*. A more recent case from the Eighth Circuit Court of Appeals also applied *Scott* in this way. *See Goffin v. Ashcraft*, 977 F.3d 687, 691 n.2 (8th Cir. 2020) (relying on *Scott v. Harris* for the proposition that whether an officer's actions were objectively reasonable is a legal question for the court).

this initial contact with law enforcement. The Sheriff initially saw Gary exit and reenter the home shortly after he arrived. Later, after law enforcement had established a perimeter around the mobile home, there were at least two reported sightings of Gary outside the mobile home. Additionally, an officer, who had the last known communication with Gary during the search, reported that Gary sounded out of breath, as if he had been running, during their phone conversation. The Hamens also point to radio traffic from law enforcement that suggested law enforcement did not believe Gary was inside the mobile home and that the mobile home had been cleared.

[¶47.] The Sheriff's knowledge of these facts and how they fit into the timeframe of the events leading up to the entry are pertinent as to whether he had an objectively reasonable belief that Gary was inside the mobile home when law enforcement forcibly entered it. The facts concerning the entire sequence of events are not amenable to quick and concise narration. They unfolded over the course of five hours and involved officers from multiple agencies receiving, at various times, information about Gary from different sources. When these events occurred, and their significance in the context of the lengthy, large-scale law enforcement operation, must first be resolved either through discovery[11] or, if disputed, by a fact

---

11. Retired Chief Justice Gilbertson's writing suggests that pretrial discovery is inconsistent with the doctrine of qualified immunity. He quotes the United States Supreme Court's opinion in *Pearson*, stating "that the 'driving force' behind the creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials will be resolved prior to discovery.'" (Gilbertson, Retired C.J., dissenting in part at ¶ 79). The quote originates from the Supreme Court's decision in *Mitchell* which, in turn, cites *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d

(continued . . .)

finder. After the circuit court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the circuit court can make the legal determination of whether the Sheriff had an objectively reasonable belief that Gary was present in the mobile home at the time of entry. *Scott*, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8. *See also State v. Rademaker*, 2012 S.D. 28, ¶ 7, 813 N.W.2d 174, 176 (Under our Fourth Amendment review, "[o]nce the facts have been determined . . . the application of a legal standard to those facts is a question of law[.]").

[¶48.] If the court concludes the Sheriff did not have an objectively reasonable belief that Gary was present in the mobile home at the time of entry, then the arrest warrant did not give law enforcement the authority to enter the home to search for him. In that event, law enforcement could not enter the home without a search warrant absent exigent circumstances. Because the Sheriff did not obtain a search warrant, we review whether he has identified undisputed facts in the record showing that exigent circumstances justified the warrantless entry.

[¶49.] Exigent circumstances to enter a home exist when law enforcement reasonably believes "that delay in procuring a search warrant would gravely

---

(. . . continued)
396 (1982), for the proposition that granting summary judgment for government officials in qualified immunity cases prior to discovery serves a number of goals *where the plaintiff failed to identify a clearly established right. Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2815 (citing *Harlow*, 457 U.S. at 817–818, 102 S. Ct., at 2737–2738). However, in cases like this one where "the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment *if discovery fails to uncover evidence sufficient to create a genuine issue* as to whether the defendant in fact committed those acts." *Id.* (Emphasis added).

endanger life, risk destruction of evidence, or greatly enhance the likelihood of a suspect's escape." *Hess*, 2004 S.D. 60, ¶ 25, 680 N.W.2d at 325. In the context of a search for a person to make an arrest, we have noted that "[e]xigent circumstances exist when there is an emergency, [and] the situation demands immediate attention and there is no time to get a warrant." *Meyer*, 1998 S.D. 122, ¶ 23, 587 N.W.2d at 724 (noting a common example of such an exigency is when law enforcement is in "hot pursuit"). The considerations this Court has deemed to be "particularly relevant" include: "1. [t]hat a grave offense is involved; 2. that the suspect is reasonably believed to be armed; 3. that a clear showing of probable cause exists, including 'reasonably trustworthy information,' to believe that the suspect committed the crime involved; 4. that there is a strong reason to believe the suspect is on the premises; 5. that a likelihood exists that the suspect will escape; 6. that the entry, though not consented to, is made peaceably; and 7. time of entry." *Id.*

[¶50.] The Sheriff claims that exigent circumstances existed because Gary was a danger to the public. He argues that Gary may have had a semi-automatic weapon and that Gary threatened to harm himself or others if law enforcement attempted to arrest him. The Hamens dispute at least some of these facts. Moreover, the record shows that law enforcement had established a perimeter around the home, presumably so Gary could not enter or leave the mobile home while law enforcement searched for him in the surrounding area. The search continued for several hours during which law enforcement made no attempt to obtain a search warrant. The Sheriff has not identified evidence in the existing record showing that an exigency was present so that law enforcement needed

immediate access to the mobile home to protect Gary or others he might harm. Given that law enforcement's last contact with Gary suggested he was no longer in the home, coupled with the fact that law enforcement had surrounded the mobile home for several hours without incident or any materialized threat from Gary, we cannot determine as a matter of law that exigent circumstances existed at the time the Sheriff decided to enter the mobile home.

[¶51.] We also conclude the Sheriff has failed to establish that he is entitled to summary judgment on the warrantless entry claim under the second prong for qualified immunity. This prong requires that existing law was so "clearly established . . . at the time of the officer's conduct" to "have placed the constitutionality of the officer's conduct beyond debate." *Wesby*, __ U.S. at __, 138 S. Ct. at 589 (internal citations omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law' . . . [so that] every reasonable official would understand that what he is doing is unlawful." *Id.*

[¶52.] "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586, 100 S. Ct. at 1380. "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585, 100 S. Ct. at 1379. In the absence of a search warrant, the Sheriff must show he had an objectively reasonable belief that Gary was living there and that he was inside the home at the time of entry; or that exigent circumstances had developed, after five hours, to enter the Hamens' mobile home. *Payton*, 445 U.S. at 603, 100 S.

Ct. at 1388; *Steagald*, 451 U.S. at 216, 101 S. Ct. at 1650. These Fourth Amendment principles were clearly established at the time the Sheriff ordered entry into the Hamens' mobile home and placed the unconstitutionality of the warrantless entry beyond debate, if neither of these exceptions are determined to be applicable. *See Ziglar*, __ U.S. at __, 137 S. Ct. at 1867 ("[A]n officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent.") (internal citations and quotation marks omitted); *Thornton*, 2005 S.D. 15, ¶ 19, 692 N.W.2d at 534 ("Lack of a body of case law on the specific circumstances does not automatically entitle an officer to qualified immunity.").

### b. Excessive force claim.

[¶53.]        In the event the entry into the Hamens' mobile home is ultimately determined to be lawful, then the Hamens' alternative claim, whether excessive force was used, must be addressed. The Sheriff challenges the circuit court's denial of his motion for summary judgment on the excessive force claim, while the Hamens argue that fact questions exist on whether the Sheriff used excessive force to enter the mobile home. Regardless of whether the Sheriff used excessive force, the Hamens cannot prevail because they cannot show that the Sheriff's use of force, even if it was excessive, violated a "clearly established" right.[12]

---

12.    Because the Hamens cannot establish that the Sheriff violated a "clearly established" right, we decline to address whether the Sheriff used excessive force.

[¶54.] The Hamens cite SDCL 23A-3-5[13] as general authority to support their excessive force claim. But they cite no authority that clearly establishes the Sheriff exceeded the parameters of SDCL 23A-3-5, or that the statute establishes a constitutional limit on the force law enforcement may use to enter a home to make an arrest. In *United States v. Ramirez*, the Court recognized that "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." 523 U.S. 65, 71, 118 S. Ct. 992, 996, 140 L. Ed. 2d 191 (1998). However, *Ramirez* does not provide guidance for determining whether the destruction of property was excessive here. Recently, in discussing the clearly established prong for qualified immunity, the United States Supreme Court expounded that "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *City of Escondido, Cal. v. Emmons*, ___ U.S. ___, ___, 139 S. Ct. 500, 503,

---

13. SDCL 23A-3-5 provides:

> Any law enforcement officer having authority to make an arrest may break open an outer or inner door or window of a dwelling house or other structure for the purpose of making the arrest if, after giving reasonable notice of his intention, he is refused admittance, and if:
>
> (1) The law enforcement officer has obtained an arrest warrant; or
>
> (2) Exigent circumstances justify a warrantless arrest.

202 L. Ed. 2d 455 (quoting *Kisela v. Hughes*, __ U.S. __, __, 138 S. Ct. 1148, 1153, 200 L. Ed. 2d 449 (2018)).

[¶55.] The Hamens have not presented authority clearly establishing that the force used to enter the mobile home, under the circumstances presented to the Sheriff, was unreasonable under the Fourth Amendment. In *Emmons*, the Court

> stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate. Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. But a body of relevant case law is usually necessary to clearly establish the answer.

__ U.S. at __, 139 S. Ct. at 504. *Emmons* further explained, in the excessive force context, that generalities are insufficient to show a clearly established right:

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. . . . An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*Id.* at 503. In the absence of excessive force precedents under similar circumstances, the Sheriff is entitled dismissal of the excessive force claim under the second prong of qualified immunity.

**Conclusion**

[¶56.] We reverse the circuit court's denial of summary judgment on the inverse condemnation claim and direct the entry of summary judgment dismissing this claim with prejudice as to the Sheriff and the County. On the Hamens' § 1983 claims, we affirm the circuit court's denial of summary judgment on the Sheriff's qualified immunity for the unlawful entry claim, but we reverse the circuit court's denial of summary judgment on the Sheriff's qualified immunity on the excessive force claim. We remand the § 1983 claim against the Sheriff for further proceedings consistent with this opinion.

[¶57.] KERN, SALTER, and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur on Issue 1.

[¶58.] KERN, SALTER, and DEVANEY, Justices, concur on Issue 2a.

[¶59.] GILBERTSON, Retired Chief Justice, dissents on Issue 2a.

[¶60.] SALTER, Justice, concurs on Issue 2b.

[¶61.] GILBERTSON, Retired Chief Justice, concurs in result on Issue 2b.

[¶62.] KERN, and DEVANEY, Justices, dissent on Issue 2b.

[¶63.] MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

KERN, Justice (concurring in part and dissenting in part).

[¶64.] I agree that our Constitution does not support an inverse condemnation claim for the property damaged in this case and join the majority opinion in reversing the circuit court's decision interpreting the damages clause

-31-

under article VI, § 13 to support the claim. *See* S.D. Const. art. VI, § 13; *accord* U.S. Const. amend. V. With regard to the Hamens' § 1983 claims, I also agree with the majority that the circuit court properly denied the Sheriff's motion for summary judgment on the Hamens' claim for unlawful entry. The matter must be remanded to the circuit court for a determination of factual questions regarding whether the Sheriff had a reasonable belief that Gary was in the home or whether exigent circumstances otherwise existed to justify the warrantless entry.

[¶65.]     However, I respectfully dissent from the majority's decision to dismiss the Hamens' alternative claim for excessive use of force. In my view, we should instead affirm the circuit court's order denying the Sheriff's motion for summary judgment on this issue. This claim should also proceed to trial, where the jury can determine through special interrogatories any disputed issues of fact. The court can then resolve the questions of law.

[¶66.]     "We review a [circuit] court's qualified immunity determination on summary judgment de novo, viewing the record in the light most favorable to [the plaintiff] and drawing all reasonable inferences in [his] favor." *Shannon v. Koehler*, 616 F.3d 855, 861-62 (8th Cir. 2010) (second and third alterations in original) (emphasis omitted). "Qualified immunity protects [g]overnment officials performing discretionary functions." *Rush v. Perryman*, 579 F.3d 908, 913 (8th Cir. 2009) (alteration in original). "In assessing a claim of qualified immunity, we . . . ask whether the plaintiff's allegations establish a violation of the Constitution." *Sherbrooke v. City of Pelican Rapids*, 513 F.3d 809, 813 (8th Cir. 2008). "If so, then we 'ask whether the right was clearly established' at the time of the violation." *Id.*

(quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)). "To defeat a claim of qualified immunity, the contours of an alleged constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Smook v. Minnehaha Cnty.*, 457 F.3d 806, 813 (8th Cir. 2006). Once the underlying facts are determined, the question whether the use of force was objectively reasonable is a question of law. *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8, 167 L. Ed. 2d 686 (2007). As the majority opinion points out, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 172 L. Ed. 2d 565 (2009). Majority Opinion ¶ 38.

[¶67.] Regarding the § 1983 excessive force claim, as a starting premise, if the court determines on remand that the Sheriff's entry into the mobile home was unlawful, then the *nature and extent* of force used is immaterial. In such case, the Sheriff is liable to the Hamens' for the damage caused by the entry. On the other hand, if the court, on remand, determines that the Sheriff lawfully entered the mobile home, the first prong of the Hamens' excessive force claim requires an assessment of whether the Sherriff's use of force while executing the arrest warrant was objectively reasonable. I respectfully disagree with the majority's determination that the Sheriff is entitled to qualified immunity as a matter of law on this claim because under prong two, the use of force was not excessive under "clearly established" law. Upon review of the underlying facts in a light most

favorable to the Hamens', existing precedent may have provided sufficiently clear guidance to law enforcement faced with the circumstances present here, such that summary judgment is improper.

[¶68.]     Destruction of property does not necessarily violate the Fourth Amendment. *See Dalia v. United States*, 441 U.S. 238, 258, 99 S. Ct. 1682, 1694, 60 L. Ed. 2d 177 (1979) (reasoning that "officers executing search warrants on occasion must damage property in order to perform their duty."). Only excessive destruction beyond that necessary to effectuate the search rises to the level of a constitutional violation. *United States v. Ramirez*, 523 U.S. 65, 71, 118 S. Ct. 992, 996, 140 L. Ed. 2d 191 (1998). "Claims of excessive force are evaluated under the reasonableness standard of the Fourth Amendment." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011).

[¶69.]     "We determine whether a use of force was reasonable by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 826. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989). "[T]he test is whether the amount of force used was objectively reasonable under the particular circumstances." *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994).

[¶70.]     Although law enforcement had a warrant for Gary's arrest, they did not have a warrant to search the Hamens' property. Regardless, even if law

enforcement had a warrant to search the property, it is well established that "possession of a . . . warrant does not give the executing officers a license to proceed in whatever manner suits their fancy." *Hummel-Jones v. Strope*, 25 F.3d 647, 650 (8th Cir. 1994) (citing *Dalia*, 441 U.S. at 257-58, 99 S. Ct. at 1693-94). "Whether a search is unreasonable by virtue of its intolerable intensity and scope must be determined by the particular facts of [each] case[.]" *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982) (citations omitted).

[¶71.] Here, even if we assume the Sheriff had an objectively reasonable belief that Gary had snuck back into the trailer such that the entry itself was lawful, there are nevertheless material issues of fact in dispute whether the force used to enter the trailer was necessary to execute the arrest warrant. *See Ginter v. Stallcup*, 869 F.2d 384, 388 (8th Cir. 1989) (citing and analyzing cases that consider under what circumstances force is necessary when executing a search warrant). For example, although there are allegations that Gary may have been armed and potentially mentally unstable, the Hamens have identified evidence supporting that, at the time of entry, Gary was not threatening the officers or communicating with them at all. Instead, the information known to law enforcement at the time suggested he was attempting to flee the area. They further presented evidence that, despite the lack of any immediate threat, law enforcement destroyed the Hamens' deck, windows, wall, and front door to drill a sizable hole into the trailer for use as a "communication portal." In the process, law enforcement also destroyed the septic system.

[¶72.]     The nature and extent of the force used here is undisputed and well documented. A police drone circled above the scene, capturing some of the incident on video, and the officers involved prepared detailed reports of the episode. The first armored vehicle approached from the west side pulling the front stairs and deck away from the trailer. It then tore off the front door of the trailer with a ram, damaging not only the door but the floor and frame. The second armored vehicle drilled three portholes on the other side through windows and a sliding glass door, destroying the septic system in the process. Minutes later, the drone captured images of Gary walking in the river near the Hamens' trailer.

[¶73.]     Viewing the underlying facts in a light most favorable to the Hamens, it is questionable whether the use of "communication portals" of the sort made here were required given the small size of the trailer, particularly when considering that, up to the point of their decision to enter the trailer, law enforcement had been using a loudspeaker to attempt to communicate with Gary. Viewed in this light, the resulting damage to the trailer was intolerable in its intensity and unnecessary to execute the burglary warrant at issue. *See Tarpley*, 684 F.2d at 9. Therefore, on the existing record, the Hamens have sufficiently established a violation of a constitutional right under the Fourth Amendment to survive a motion for summary judgment.

[¶74.]     Moving to the second prong, the United States Supreme Court has counseled against defining a clearly established right "at a high level of generality." *White v. Pauly*, __ U.S. __, __, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017). Rather, "the clearly established law must be particularized to the facts of the case." *Id.* It

ordinarily requires that "existing precedent [has] placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, __ U.S. __, ___, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018). The majority opinion concludes that because the Hamens have failed to point this Court to "excessive force precedents under similar circumstances," the Sheriff is entitled to qualified immunity. *See supra* Majority Opinion ¶ 55.

[¶75.] Assuming, however, that no precedent exists that is similar enough to apply to these facts, it is well established that there does not always need to be a case "directly on point for a right to be clearly established[.]" *Kisela*, __ U.S. at ___, 138 S. Ct. at 1152. As the Supreme Court has reiterated on multiple occasions, analogous case law is not necessary in "obvious cases." *See D.C. v. Wesby*, __ U.S. ___, ___, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018) ("[T]here can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.").[14] Then Tenth Circuit judge, Neil Gorsuch, put it best when explaining that "some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it

---

14. *See, e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law."); *Hope v. Pelzer*, 536 U.S. 730, 731, 122 S. Ct. 2508, 2510, 153 L. Ed. 2d 666 (2002) (holding that the facts alleged in this case met the obviousness standard because the "safety concerns had long since abated[.]").

is so flagrantly unlawful that few dare its attempt." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015).

[¶76.]    From an objective review of the record, this may be such a case. If we accept the Hamens' version of the facts as true, the Sheriff's use of force rose to such a level of egregiousness that "every reasonable official would have understood that" the actions violated the Hamens' constitutional rights. *See Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015). When the armored vehicles rolled away, they left behind structural damage to the Hamens' trailer totaling $18,778.61. To repair it, the Hamens were required to replace multiple doors and windows, the septic system, the skirting, the deck, studs, and insulation.

[¶77.]    There is often a great and justifiable need for law enforcement to make split-second decisions in tense, rapidly evolving circumstances and to employ appropriate equipment to protect themselves and the public while doing so. *See Graham*, 490 U.S. at 396, 109 S. Ct. at 1871-72. But unlike other cases where an extreme use of force was found to be reasonable, here, Gary was not barricaded inside the trailer with hostages, or shooting at law enforcement, or threatening to do so. *See Ginter*, 869 F.2d at 388. Moreover, law enforcement could have taken incremental steps to clear the trailer with the hope of communicating with Gary to urge him to come out peaceably, or they could have simply waited him out, rather than tearing apart the trailer absent an immediate threat. Insulating those who "knowingly violate the law[,]" has never been the purpose of the qualified immunity doctrine. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

[¶78.] As the circuit court noted in its memorandum decision, "whether the communication portals were necessary at all, constitutes question(s) of fact." I agree with the circuit court's assessment and would affirm the court's denial of summary judgment on both the unlawful entry and excessive force claims. If it becomes necessary to address the excessive force claim, it will be up to the circuit court to determine whether the Sheriff has met his burden of showing that the force used was objectively reasonable. If the court finds it was not objectively reasonable but the Hamens fail to identify existing precedent with sufficiently similar circumstances, the court should then consider whether the facts nevertheless rise to the level of an obvious abuse under clearly established law.



#28671







GILBERTSON, Retired Chief Justice (concurring in part and dissenting in part).

[¶79.]　　　　I agree with Chief Justice Jensen's writing on the first issue regarding inverse condemnation. However, I disagree with Chief Justice Jensen's and Justice Kern's analyses of qualified immunity. Both overlook that immunity is a question of law for a court, not a jury, to decide. *See Swedlund*, 2003 S.D. 8, ¶ 12, 657 N.W.2d at 45 ("Immunity is a legal question to be decided by the court . . . ."). The United States Supreme Court has repeatedly stated "qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (quoting *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2808). "[W]e have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2, 107 S. Ct. 3034, 3039 n.2, 97 L. Ed. 2d 523 (1987)) (second alteration in original).

[¶80.] When resolving the issue of qualified immunity on summary judgment, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott*, 550 U.S. at 378, 127 S. Ct. at 1774 (quoting *Diebold, Inc.*, 369 U.S. at 655, 82 S. Ct. at 994). Both the writings of Chief Justice Jensen and Justice Kern overlook this basic concept. Chief Justice Jensen acknowledges the existence of disputed facts, but then states, they should be "resolved either through discovery or, if disputed, by a fact finder." Jensen, C.J., Majority Opinion at ¶ 47. Neither party's brief requests additional time for discovery. If the circuit court found the existence of disputed facts, it was to view the facts in a light favorable to the Hamens, and then rule on the issue of qualified immunity. It is a disservice to the doctrine to continue litigating while the question of qualified immunity remains.

[¶81.] The circuit court instead of deciding whether, as a matter of law, qualified immunity existed, punted the question to the jury. The conflicting writings today render immunity essentially worthless as they require a defendant to run the gauntlet of trial, fleshing out factual disputes, prior to the circuit court rendering a qualified immunity decision. This holds the potential to waste the court's and the parties' resources and runs counter to the spirit of qualified immunity, which is to "resolv[e] immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S at 232, 129 S. Ct. at 815.

[¶82.] The circuit court should have resolved all factual disputes in favor of the Hamens, decided whether qualified immunity existed as a matter of law, and then either granted summary judgment or permitted the case to proceed to trial if it

found immunity did not exist. As such, I would remand the issue of qualified immunity to the circuit court for it to render a decision on whether qualified immunity exists. Then, if the circuit court denies the Sheriff's motion for summary judgment, in turn denying immunity, the case may proceed to trial.