**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-3191
_____

RICHARD MILLER; TONYA CRAWLEY,
Appellants

v.

CITY OF PHILADELPHIA; DETECTIVE BOVA;
DETECTIVE LUCKE; DETECTIVE CRAIG COULTER;
DETECTIVE GRACE; SWAT OFFICER LT. MONK;
SWAT OFFICER SGT. MELLODY; SWAT OFFICER
OLDRATI; SWAT OFFICER HOUGH; SWAT OFFICER
CLARK; SWAT OFFICER HAMOY; SWAT OFFICER
RECHNER; SWAT OFFICER FITZPATRICK; SWAT
OFFICER BURKITT; SWAT OFFICER SABA; POLICE
OFFICERS JOHN DOES 1–10
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:23-cv-04762)
District Judge: Honorable Paul S. Diamond
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on October 31, 2025

Before: BIBAS, SCIRICA, and SMITH, *Circuit Judges*

(Filed: December 15, 2025)

Alan E. Denenberg
Jason Parris
ABRAMSON & DENENBERG
1315 Walnut Street, Suite 500
Philadelphia, PA 19107
    *Counsel for Appellants*

Catherine Baldwin
Craig R. Gottlieb
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street
Philadelphia, PA 19102
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

BIBAS, *Circuit Judge*.

To err is human; police are no exception. Early one morning, Philadelphia police burst into a house to arrest a suspect in a drive-by shooting investigation. But they had the wrong house. Even so, they had probable cause to think their suspect was there. And no one alleges that the City was aware of a pattern of police officers unconstitutionally entering homes. So the District Court properly granted summary judgment for the police officers and dismissed the municipal-liability claim.

2

## I. The Arrest Warrant Gone Wrong

In late 2021, while walking to school, a fourteen-year-old boy was "brutally executed" in Philadelphia, shot more than thirty times by two carloads of people. JA 365. Police soon identified five suspects, including T.C., and got an arrest warrant for him. T.C. was eighteen at the time.

With the warrant in hand, Detective Craig Coulter started trying to find T.C. He searched three databases. One was CLEAR, which "cross-references utility bills, taxes, credit reports, and the like." JA 402. The other two were a police arrest database and a police criminal-history database. CLEAR listed several addresses for T.C. The most recent entry pointed to 4838 Stenton Avenue, a rowhouse in Philadelphia's Germantown neighborhood. The arrest and criminal-history databases also listed that as his address, based on a 2017 arrest. A search for T.C.'s mother in CLEAR yielded the same address.

Satisfied that T.C. lived at 4838 Stenton Avenue, Coulter and a colleague, Detective Richard Bova, prepared to execute the warrant. One morning, just before 6 a.m., SWAT officers arrived at that address and broke down the front door. But T.C. was not there. Instead, officers found Richard Miller and Tonya Crawley, who had moved into the house two years earlier. Rifles in hand, the officers ordered Miller and Crawley to go downstairs. They did not let Miller get his cane, though he struggles to walk. When Crawley asked why the officers were there, one barked: "Shut the f*** up." JA 11, 126–27.

While some officers searched the residence, others interviewed Miller and Crawley, learning that they did not know T.C. and that he no longer lived there. Soon after, the police

3

left. Officers later found T.C. and cleared him of any wrong-doing.

Miller and Crawley were understandably upset at how they had been treated. So the couple sued the detectives, the SWAT officers, and the City of Philadelphia under 42 U.S.C. § 1983. They claimed that the officers had lacked probable cause and so violated the Fourth Amendment, and that the City had failed to train or supervise its officers on how to apply for and execute warrants properly.

The District Court dismissed the municipal-liability count for failure to state a claim. It later granted summary judgment on the unlawful-entry claim, holding as a matter of law that the officers had probable cause to enter the house.

We review the District Court's dismissal and summary judgment de novo. *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018); *Tundo v. Cnty. of Passaic*, 923 F.3d 283, 286–87 (3d Cir. 2019).

## II. SUMMARY JUDGMENT FOR THE OFFICERS WAS PROPER

### A. The District Court mistakenly relied on good-faith cases

In finding probable cause, the District Court appeared to suggest that the good-faith rule could help establish the existence of probable cause. *See* JA 409 ("[P]robable cause existed on which to base the arrest warrant. … Officers plainly obtained and executed the warrant in good faith."); *see also* JA 407 ("Even if the underlying information is incorrect, the good-faith exception will apply unless a 'reasonably well-trained officer would have known the search was illegal' despite the warrant.") (quoting *United States v. Leon*, 468 U.S. 897, 922

4

n.24 (1984)). But those two things are distinct. The good-faith exception to the exclusionary rule says that even if an officer has violated the Fourth Amendment, courts will not exclude the resulting evidence from criminal cases unless there is "systemic negligence" or the officer acted "deliberate[ly], reckless[ly], or grossly negligent[ly]." *Herring v. United States*, 555 U.S. 135, 144 (2009). That issue is separate from whether an officer had probable cause in the first place. So the District Court erred by relying in part on the good-faith exception.

### B. The error was harmless, because the officers had probable cause

Even so, the District Court's error made no difference. Under *Payton v. New York*, an officer may enter a home to execute an arrest warrant if he has probable cause to believe that (1) the arrestee lives there and (2) he is present then. 445 U.S. 573, 603 (1980); *United States v. Vasquez-Algarin*, 821 F.3d 467, 472, 477 (3d Cir. 2016). An officer need not be certain or take every possible step to corroborate his information. It is enough to have "reasonably trustworthy information" that would lead a "reasonabl[y] cautio[us]" officer to conclude, given all the circumstances, that the arrestee is at that address. *See United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). Though probable cause is typically a jury question, a judge may find it as a matter of law if the evidence would not reasonably support any other finding. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997).

*1. The officers had probable cause to believe that T.C. lived at 4838 Stenton Avenue.* The officers satisfied the first *Payton* prong. They did not just rest on unproven informants or take a

detective's word for it. *Cf. Vasquez-Algarin*, 821 F.3d at 480–81 (holding those bases insufficient on their own to show probable cause). Rather, Coulter relied on three reasonably trustworthy sources, all of which pointed to the Stenton Avenue address. One was CLEAR, which pulls information from taxes, credit reports, utility bills, and the like. Coulter then checked the CLEAR data against the arrest and criminal-history databases for T.C., as well as the CLEAR data for his mother. That was enough. *Cf. United States v. King*, 604 F.3d 125, 131, 137–38 (3d Cir. 2010) (finding probable cause based on officers' tracing defendant's phone number to the address).

The couple resists that conclusion in three ways, but all fall short. *First,* they assert that the officers "were unable to testify as to the reliability of CLEAR's records." Appellants' Br. 20. Not so. Coulter gave unrebutted testimony that CLEAR was accurate "[m]ore times than not," and Bova testified similarly that it was "pretty accurate." JA 223, 370. *Second,* the couple complains that the address that T.C. self-reported when arrested in 2017 was too stale to support probable cause. But the officers corroborated that address using CLEAR, which said T.C. still lived there. *Third,* the couple argues that the officers could have sought more corroboration. But they had good reasons not to. Bova testified that a minor is unlikely to have a registered car and cannot vote, so it made little sense to check voter rolls or motor-vehicle records. He also explained that asking friends and family could have alerted T.C. that police were looking for him. Plus, once officers have probable cause, they need not "undertake an exhaustive investigation" or "interview everyone who may have possessed relevant information." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000)

(first quotation); *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 250–51 (3d Cir. 2001) (second quotation) (emphasis omitted).

*2. The officers also had probable cause to believe that they would find T.C. at home on a Thursday morning at 5:50 a.m.* The officers satisfied the second *Payton* prong as well. "[O]nce the predicate of residency is established, that alone carries significant weight in establishing probable cause to believe the arrestee is present." *Vasquez-Algarin*, 821 F.3d at 481. Even so, courts must scrutinize, case by case, whether "other indicia support[ed] [law enforcement's] belief that the suspect [was] then inside." *Id.*

Here, the police knew that T.C. was around high-school age. Maybe he was in school, back a grade; maybe he worked during the day. Either way, police reasonably inferred that T.C. (unlike, say, a suspect known to work as a night watchman) was probably at home at the crack of dawn, well before the start of school or most people's workdays. *See United States v. Veal*, 453 F.3d 164, 168 (3d Cir. 2006) (noting that "it [is] reasonable to expect that residents or guests would still be present" "early in the morning" and collecting cases); 3 Wayne R. LaFave, *Search and Seizure* § 6.1(a) (6th ed. 2020) ("[T]he police need not possess 'special knowledge' that the defendant is at home in order to meet the probable cause test, for in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there."). Our dissenting colleague, relying on extra-record sources about when some students commute to high school, doubts that assessment. *See* Partial Dissent 6–7. But probable cause demands only "reasonable grounds" for a belief, not perfection. *Illinois*

7

*v. Gates*, 462 U.S. 213, 243 (1983); *see also Vasquez-Algarin*, 821 F.3d at 475. And even our colleague admits that "[s]ome (maybe even most) members of [the high-school] cohort will be home at 5:50 a.m. on a typical Thursday." Partial Dissent 6. The officers' inference was reasonable.

Our dissenting colleague would hold that even once police have probable cause to believe that a suspect lives at an address, they must also have case-specific evidence to show that the suspect will be home precisely when they execute the warrant. Partial Dissent 7–8. Our colleague would put that burden on law enforcement in every case, even if the underlying crime is serious, and even if the extra investigation could tip a suspect off that police are on his tail. But as the District Court noted, "the initial arrest [in a murder investigation] requires 'speed and surprise,'"; asking around the neighborhood for a suspect's whereabouts, or surveilling the street for a long time, "could well alert a suspect and endanger the officers." App. 16.

Our precedents do not support our dissenting colleague's restrictive, bright-line rule. In *Vasquez-Algarin*, for example, we concluded that the officers had flunked both prongs of *Payton*. 821 F.3d at 481. The lack of probable cause to believe the suspect resided at the address the officers searched, we explained, doomed any probable cause to think that he was there when they executed the warrant. *Id.* at 482. That analysis has no bearing here, where even our colleague agrees that the officers had probable cause to believe that T.C. lived at 4838 Stenton Avenue. *See* Partial Dissent 1. Our colleague's out-of-circuit citations fare no better. Those cases merely state the commonsense requirement that police need to have particularized information about a suspect. *See id.* at 4 (citing *United States*

*v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006) and *Valdez v. McPheters*, 172 F.3d 1220, 1230–31 (10th Cir. 1999) (Ebel, J., concurring in part and dissenting in part)). Here, the officers did: They had (what they reasonably believed was) T.C.'s address, knew that he was eighteen, and reasonably inferred that he was likely to be home early in the morning on a weekday.

At bottom, our colleague's approach would defy longstanding case law treating probable cause as a "flexible, common-sense standard." *Gates*, 462 U.S. at 239; *see also United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007) (rejecting the view that "reasonable belief cannot exist unless the government has some specific evidence that the suspect is present at the particular times that officers come to arrest him"). Neither the Fourth Amendment nor our precedent requires our colleague's wooden approach, and we respectfully decline to adopt it.

To be clear, we do not hold that the time of day, standing alone, is always enough to amount to probable cause that a suspect is at home. We simply hold that here, the very early hour, coupled with officers' knowledge of T.C.'s age and probable cause as to his address, gave the police probable cause to believe that T.C. was at home when they went to execute his arrest warrant. Since the officers had probable cause as a matter of law, the District Court properly granted them summary judgment on the couple's unlawful-entry claim.

## III.  DISMISSAL OF THE MUNICIPAL-LIABILITY CLAIM WAS PROPER TOO

The couple's claim against Philadelphia fares no better. They allege that the City failed to train and supervise its police

9

on how to dig up trustworthy address information before getting and executing arrest warrants. A city's failure to train or supervise its officers can make it liable only when that failure "amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).

There are two ways to show deliberate indifference, but the amended complaint does not adequately allege either of them. *First*, a plaintiff must "ordinarily" allege a "pattern of similar constitutional violations by untrained [or unsupervised] employees" that put the city on notice. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation marks omitted). But as the District Court found, the amended complaint lacks facts that would have put the City on notice of a pattern of inadequately investigating addresses. Instead, it teems with legal conclusions. Those "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

True, one paragraph in the amended complaint does list ten cases in which Bova is being sued. But it says nothing more than that. As the District Court observed, it "do[es] not allege whether those cases involved similar unlawful conduct or if policymakers were aware of such conduct." JA 82. Those omissions are fatal to municipal liability based on a pattern.

*Second,* in unusual cases, a plaintiff can show a city's deliberate indifference even without a pattern of prior constitutional violations. *See Canton*, 489 U.S. at 390 n.10; *Connick*, 563 U.S. at 63–64. But single-incident municipal liability is

10

vanishingly rare. *Hightower v. City of Phila.*, 130 F.4th 352, 357 (3d Cir. 2025). It requires something like giving guns to the police without training them on when they may shoot fleeing felons. *See Canton*, 489 U.S. at 390 n.10. "Not even failing to train prosecutors on their ... disclosure duties [under *Brady v. Maryland*, 373 U.S. 83, 87 (1963)] is enough." *Hightower*, 130 F.4th at 357 (citing *Connick*, 563 U.S. at 64). Nothing here rises to that extreme level. So the District Court properly dismissed the municipal-liability claim.

\* \* \* \* \*

Miller and Crawley were understandably shaken when police burst into their bedroom before 6 a.m. to arrest someone who no longer lived there. "But a mistake, though it may be terrible in its effects, is not always … a constitutional violation." *Curley v. Klem*, 499 F.3d 199, 216 (3d Cir. 2007). Because the officers had probable cause to believe that T.C. still lived at 4838 Stenton Avenue and would be home at that hour, we will affirm the District Court's summary judgment on the unlawful-entry claim. And because there was no pattern of constitutional violations that would have put the City on notice of a problem, we will affirm the District Court's dismissal of the municipal-liability claim.

11

*Miller v. City of Philadelphia, No. 24-3191*

Smith, *Circuit Judge*, concurring in part and dissenting in part.

Not always faithful to reality in its depiction of American litigation and courtroom procedure, classic cinema does authentically uphold one principle of American jurisprudence: "There's no place like home." Our constitutional law reifies this incantation: "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). The threshold of even the humblest abode is a Rubicon, and to carelessly cross it is to commit "the chief evil" our Constitution guards against. *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972). For this reason, to execute an arrest warrant at a suspect's home, police must establish probable cause to believe that the arrestee (1) resides at the dwelling; and (2) will be present at the time they enter the premises. *See United States v. Vasquez-Algarin*, 821 F.3d 467, 472 (3d Cir. 2016) (citing *Payton v. New York*, 445 U.S. 573 (1980)).

The majority and I agree that the police in this case satisfied the first prong. We also concur on the basic, operative facts upon which we resolve the issues presented. To quote: "Early one morning, Philadelphia police burst into a house to arrest a suspect in a drive-by shooting. But they had the wrong house." Majority Op. at 2. But the majority opinion goes on to declare: "Even so, they had probable cause to think their suspect was there." *Id.* I agree that the police had probable cause to believe their suspect *had* resided at the residence they forcibly entered but not that he "was there" at the time they executed the arrest warrant. This is more than a syntactical

1

quibble (*i.e.*, "was there" (past) versus "had been there" (past perfect)). Tense, in this case, has serious constitutional implications. Unlike the majority, I am not convinced that probable cause to believe a suspect *had* resided in a dwelling, plus a mere generalization about what time of day people are usually at home is sufficient to establish probable cause to believe the suspect *was* present when police entered the residence. Accordingly, I dissent.[1]

I

There is no rigid definition of probable cause. *See Illinois v. Gates*, 462 U.S. 213, 232 (1983) (explaining that probable cause is "not readily, or even usefully, reduced to a neat set of legal rules"). It is a "fluid concept" that exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in [his] belief[.]" *Ornelas v. United States*, 517 U.S. 690, 696 (1996). That means that what suffices in one case may prove inadequate in another, and vice versa. But mutability does not imply limitlessness. There are bounds even to reasonableness beyond which law enforcement's justifications are categorically unacceptable. As I see it, the police leapt to the conclusion that, because they had reason to believe their suspect was a resident of 4838 Stenton Avenue, they also had probable cause to believe that he would

---

[1] I join the majority in Part II.A., explaining that the District Court erred by relying on the good-faith exception to justify probable cause, and Part III, affirming the District Court's dismissal of Appellants' municipal liability claim.

2

be present when they forced their way into the residence. In that supposition, they crossed the bounds of reasonableness.

On December 1, 2021, Philadelphia police sought and obtained an arrest warrant for an 18-year-old murder suspect, T.C.,[2] who officers reasonably believed resided at 4838 Stenton Avenue. The Philadelphia Special Weapons and Tactics team (SWAT) executed the warrant the following morning, Thursday, December 2. At 5:50 a.m., they smashed through the door of the home only to discover that their quarry was not around. Instead, they encountered two frightened occupants, Richard Miller and Tonya Crawley who, after questioning, confirmed that T.C. no longer resided there. Miller and Crawley later sued under 42 U.S.C. § 1983, alleging, as relevant here, that the entry into their home violated the Fourth Amendment. The District Court disagreed. It granted summary judgment to defendants, holding that they had established probable cause to believe both that T.C. resided at 4838 Stenton Avenue and that he would be present when SWAT forced their way into the home. The Court staked its latter conclusion solely on the time of day—"5:50 a.m., a time when a resident is likely to be home." JA407. That appears to satisfy the majority. For me, it falls short.

## II

The two-prong *Payton* test requires probable cause of both residency and presence. *See Vasquez-Algarin*, 821 F.3d at 472. These are not isolated concepts but rather biographical and temporal components, respectively, of a singular inquiry—

---

[2] Police suspected T.C. had committed the gruesome murder of a 14-year-old. The cruel irony here is that he was later cleared.

whether the subject of an arrest warrant is likely to be at a particular place at a particular time. The prongs, therefore, operate in a certain synergy. "[T]he predicate of residency . . . alone carries significant weight in establishing probable cause to believe the arrestee is present, necessarily reducing the quantum of proof needed to meet [the] second prong in the totality of the circumstances analysis." *Id.* at 481. But "[u]ltimately, . . . that analysis must be made on a case-by-case basis, accounting not only for the fact that there is an increased likelihood the arrestee will be found in his own home but *also for other indicia supporting law enforcement's belief that the suspect is then inside.*" *Id.* (emphasis added) (collecting cases).

I agree that time of day bears on the likelihood of a subject's presence. But as the sole indicium of the likelihood of presence at a particular time and place, it seems—at least in this case—more sociology than individual case study. It *presumes* conformity to custom but never subjects that presumption to the kind of particularized scrutiny that probable cause demands. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (stating that "probable cause is a reasonable ground for belief of guilt" and that "belief of guilt must be *particularized* with respect to the person to be searched or seized") (emphasis added); *see Vasquez-Algarin*, 821 F.3d at 476 ("[T]he Supreme Court uses the 'probable cause' standard almost exclusively to assess the basis and strength of an officer or magistrate's belief that a *particular* person has committed a *particular* crime or that an article subject to seizure can be found at a *particular* location[.]") (emphasis added). Caselaw across the circuits implicitly affirms the principle that evidence of how people behave in the aggregate is no substitute for evidence of the habits and proclivities of a specific individual. *See United*

4

*States v. Hardin*, 539, F.3d 404, 421-24 (6th Cir. 2008) (collecting cases); *see also Vasquez-Algarin*, 821 F.3d at 482 (requiring more than "generic evidence"); *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006) (requiring an investigation of the suspect's background information); *Valdez v. McPheters*, 172 F.3d 1220, 1230-31 (10th Cir. 1999) (Ebel, J., concurring in part and dissenting in part) ("[O]fficers must possess some *specific* facts that indicate a suspect will be found within his or her home at the time, on the day the officers decide to search[.]"). So generalizations drawn from population-level data are, by themselves, almost always insufficient to satisfy *Payton*'s second prong. Law enforcement must, at the very least, supply some reason to suspect adherence to a prevailing practice. As the Sixth Circuit has observed, this often involves: "recent, eyewitness evidence connecting the suspect to the residence" and/or "conduct by the suspect that demonstrates a tie to the residence." *Hardin*, 539 F.3d at 421; *see Vasquez-Algarin*, 821 F.3d at 481 (requiring "other indicia supporting law enforcement's belief that the suspect is then inside").

In the instant case, officers had neither. They tendered only the impersonal assumption that most people are usually home at 5:50 a.m. If that is enough to establish probable cause, then law enforcement's investigative work reduces to a collection of crude statistical inferences. And the police have no incentive to undertake individual assessments because generalizations here get a foot in the door (quite literally).[3] We

---

[3] Remarkably, the majority explicitly sanctions this perverse incentive, crediting the "reasonableness" of law enforcement's inference that T.C. would be home at the "crack of dawn"

5

have before us a quintessential example of the dangers that endorsing such a paradigm entails.

As of December 2, 2021, T.C. was 18, high-school age. Some (maybe even most) members of that cohort will be home at 5:50 a.m. on a typical Thursday. But there will be numerous exceptions. Student athletes frequently leave the house in the early morning. *See* Chris Stankovich, *Morning Sports Practice Before School is Becoming the Norm, but is This Healthy for Kids?*, THE SPORTS DOC CHALK TALK (Mar. 20, 2023), https://drstankovich.com/morning-sports-practice-before-school-is-becoming-the-norm-but-is-this-healthy-for-kids/ ("The majority of student athletes I see these days regularly wake up well before 6AM in order to get to school so that they can practice and/or lift with their team[.]"); Jon Solomon, *Practice in Mornings Can Grow High School Sports Access*, PROJECT PLAY (Sept. 28, 2021), https://projectplay.org/news/small-urban-public-high-schools (profiling a student at Philadelphia's Science Leadership Academy who "woke up by 5:30 [a.m.]" many mornings to attend her high school basketball practices). A recent study found that Philadelphia area high school students "need to leave home" anywhere from "6:00am to 8:45am" just "to get

---

because he was not "known to work as a night watchman." Majority Op. at 7. Of course, he wasn't known to work as *anything* because police made no effort to investigate his personal background. Under the majority's view, this deliberate ignorance is a key to the front door. But if a lack of knowledge is enough to sustain an inference, then *any* inference the police make is reasonable so long as they studiously avoid facts that might undermine it.

6

to school on time." That suggests that students who want to accomplish anything prior to the first bell will sometimes have to depart prior to 5:50 a.m. Molly Pileggi, et al., *How Long Does It Take Philadelphia High Schoolers to Get to School? Transit Times to School District of Philadelphia High Schools in 2018*, PHILADELPHIA EDUCATION RESEARCH CONSORTIUM, at iii (Aug. 2020), https://phledresearch.org/wp-content/uploads/2020/08/PERC-HowLongDoesItTakePhiladelphiaHighSchoolerstoGettoSchool.pdf (average commute times for different schools range from 16 to 70.5 minutes). And as an 18-year-old, T.C. also could have been a high school dropout, college student, member of the workforce,[4] or some combination of the three, each permutation likely to inform his probable whereabouts. Had police considered any of this, they may not have conducted their raid when they did. As we recognized when first applying the probable cause standard to *Payton*, "[o]ur choice about how much and what kind of information" law enforcement needs "affects not only the homes of arrestees but also *any home that could be mistaken for one*." *Vasquez-Algarin*, 821 F.3d at 473 (emphasis added). We struck a balance between "respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic," *Payton*, 445 U.S. at 601, and the practical realities of policing,

---

[4] The majority enumerates these possibilities but fails to reckon with what they demonstrate. Namely, that law enforcement performed no individualized inquiry into T.C. Police did not even "check [his] school records," JA333, so they knew only that he was of "high-school age," Majority Op. at 7, but not if he attended high school.

which necessarily involves some measure of uncertainty, *see Hill v. California*, 401 U.S. 797, 804 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment[.]"). That said, the measure of probability required here was, by my lights, insufficient to sustain that balance.

## III

The majority faults this dissent for its "wooden approach," Majority Op. at 9, which would "hold that even once police have probable cause to believe that a suspect lives at an address, they must also have case-specific evidence to" establish probable cause "that the suspect will be home precisely when they execute the warrant," *Id.* That critique, however, is properly directed to the Founders. The requirement is not mine but the Constitution's. *See Payton*, 445 U.S. at 603 ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within*.") (emphasis added). The majority admits as much. *See* Majority Op. at 8 (noting "the commonsense requirement that police need particularized information about a suspect"). Yet its holding turns entirely on a generalization: what time of day the archetypal 18-year-old is likely to be home.

Cognizant of this conclusion's infirmity, the majority disclaims it. *See* Majority Op. at 9 ("To be clear, we do not hold that time of day, standing alone, is always enough to amount to probable cause that a suspect is at home."). But its efforts to manufacture additional indicia of presence belie the truth. The only other factors the opinion identifies are the predicate of

residency and the severity of the underlying crime. The former determines whether police have satisfied *Payton*'s first prong. If it also controls prong two, then the test collapses into itself— police who have probable cause of residency have probable cause of presence because a resident is likely to be present at his home. This is inconsistent not only with our precedent, *see Vasquez-Algarin*, 821 F.3d at 481, but basic logic. The existence of a second prong implies the need for more than what satisfies the first. Police must, therefore, identify *additional* factors supporting probable cause of presence. *See id.* As already explained, time of day, alone, should not suffice. Nor can the severity of the suspected crime convert such a generalization into a particularized deduction. If anything, the perpetrator of a heinous crime is *less* likely to maintain a standard schedule. Evading arrest tends to disrupt one's daily routine. But rather than evaluate what effect, if any, the severity of a crime has on probable cause of presence, the majority deploys this novel factor to excuse the police from having to establish probable cause of presence altogether. It decries the "burden" *Payton*'s second prong places on law enforcement. Majority Op. at 8. And it dismisses certain investigative techniques as incompatible with the exigencies of high stakes policework. What it conspicuously fails to do, though, is demonstrate how a suspect's alleged commission of a serious crime increases the likelihood of that suspect's presence at his residence. And that is what matters. Otherwise, the seriousness of the offense is not a factor that satisfies *Payton*'s second prong but an exception to it. Indeed, under the guise of "reasonableness," the majority opinion affords police the freedom to disregard *Payton*'s second prong if they find the underlying crime sufficiently severe. I would not hamstring

9

law enforcement by mandating stubborn adherence to any specific investigative technique. But I would hold the police to their "burden," a "burden" perhaps better characterized as the individual's sole defense against flagrant violations of core constitutional rights.

## IV

We have never held that time of day, without more, meets the probable cause requirement of *Payton*'s second prong. And across the federal judiciary, decisions that cite time of day as a factor almost always require more. *See United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007) (officers had probable cause to believe the arrestee would be home because he told them he was usually home during the day, he worked from home, and had only been absent once during officers' previous visits); *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006) (officers relied on the suspect's friend's "assertion that [he] was in the residence at the time selling drugs"); *United States v. Beck*, 729 F.2d 1329, 1331-332 (11th Cir. 1984) (per curiam) (officers relied on time of day *and* the fact that the suspect's car was parked outside the residence); *see also United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009) (officers "received a tip that [the suspect] was staying at [the] apartment and that he would be there the following morning," and when they arrived, they asked the suspect's "girlfriend if [he] was inside and she nodded yes and started crying"); *United States v. Route*, 104 F.3d 59, 63 (5th Cir. 1997) (officers relied on the sound of the television inside the residence and the presence of a vehicle in the driveway). In fact, while various cases recognize time of day as relevant, the

majority identifies none that hold it independently sufficient.[5] The dearth of support confirms the weakness of the majority's position.

I cannot fault law enforcement for acting with swiftness in its efforts to apprehend a person believed to have committed a drive-by shooting of a 14-year-old. They sought a vicious killer. Nor can I fault police for deploying a tactical unit trained to both forcibly enter a residence and to use, if necessary, deadly force. "Second-guessing" law enforcement has no place in our Fourth Amendment jurisprudence. Yet at the same time, I cannot overlook what I consider to have been a failure to adequately investigate T.C.'s likely whereabouts. A little more effort and a little less haste might have avoided the embarrassing and allegedly traumatic encounter that led to this lawsuit. That is why we require officers executing arrest warrants to demonstrate probable cause of presence. "[A]nything less . . . defeat[s] the stringent protection the home

---

[5] Appellees point to *United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005), which appears to have held that police had probable cause of presence based solely on time of day. However, as we noted in *Vasquez-Algarin*, the D.C. Circuit is among the minority of courts that read *Payton* to require something "less than probable cause[.]" *Vasquez-Algarin*, 821 F.3d at 474. In fact, we explicitly cited to *Thomas* in *Vasquez-Algarin* to support our contention that the "choice to depart from the probable cause standard and the protections it affords" leads courts "to require significantly less evidence[.]" *Id.* at 476. So even if time of day was sufficient in *Thomas*, that does not mean that it meets the heightened bar our Court imposes.

11

is due." *Vasquez-Algarin*, 821 F.3d at 479. Accordingly, I respectfully dissent.